# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2022AP1329 |

| | |
|---|---|
| COMPLETE TITLE: | In re the termination of parental rights to B. W., a person under the age of 18: |
| | |
| | State of Wisconsin,        Petitioner-Respondent,    v. |
| | B. W.,        Respondent-Appellant-Petitioner. |

REVIEW OF A DECISION OF THE COURT OF APPEALS

| | |
|---|---|
| OPINION FILED: | June 27, 2024 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | March 19, 2024 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Milwaukee |
| JUDGE: | Ellen R. Brostrom |

JUSTICES:

ZIEGLER, C.J., delivered the majority opinion of the Court, in which REBECCA GRASSL BRADLEY, DALLET, HAGEDORN, and KAROFSKY, JJ., joined, and in which ANN WALSH BRADLEY and PROTASIEWICZ, JJ., joined except ¶¶65-67. ZIEGLER, C.J., filed a concurring opinion, in which REBECCA GRASSL BRADLEY, J., joined. ANN WALSH BRADLEY, J., filed a concurring opinion, in which PROTASIEWICZ, J., joined.

NOT PARTICIPATING:

ATTORNEYS:

For the respondent-appellant-petitioner, there were briefs filed by *Christopher D. Sobic*, assistant state public defender. There was an oral argument by *Christopher D. Sobic*, assistant state public defender.

For the petitioner-respondent, there was a brief filed by *Jenni Spies Karas*, assistant district attorney. There was an oral argument by *Jenni Spies Karas,* assistant district attorney.

A guardian ad litem brief was filed by *Courtney L.A. Roelandts*, and *The Legal Aid Society of Milwaukee, INC., Milwaukee*. There was an oral argument by *Courtney L.A. Roelandts*.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.  2022AP1329
(L.C. No.  2021TP102)

STATE OF WISCONSIN  :  IN SUPREME COURT

In re the termination of parental rights to
B.W., a person under the age of 18:

State of Wisconsin,

      Petitioner-Respondent,

   v.

B.W.,

      Respondent-Appellant-Petitioner.

**FILED**

**JUN 27, 2024**

Samuel A. Christensen
Clerk of Supreme Court

---

ZIEGLER, C.J., delivered the majority opinion of the Court, in which REBECCA GRASSL BRADLEY, DALLET, HAGEDORN, and KAROFSKY, JJ., joined, and in which ANN WALSH BRADLEY and PROTASIEWICZ, JJ., joined except ¶¶65-67.  ZIEGLER, C.J., filed a concurring opinion, in which REBECCA GRASSL BRADLEY, J., joined.  ANN WALSH BRADLEY, J., filed a concurring opinion, in which PROTASIEWICZ, J., joined.

---

REVIEW of a decision of the Court of Appeals.  *Affirmed.*

¶1  ANNETTE KINGSLAND ZIEGLER, C.J.  This is a review of an unpublished decision of the court of appeals, State v. B.W., No. 2022AP1329, unpublished slip op. (Wis. Ct. App. Sept. 12,

2023), affirming the circuit court[1] orders terminating B.W.'s parental rights and denying B.W.'s post-disposition motion to withdraw his no-contest plea. We accepted B.W.'s petition to review the court of appeals' decision. We affirm the court of appeals.

¶2 This petition concerns the following two issues:

1) When a parent in a termination of parental rights case enters a no contest plea to grounds, is the circuit court's plea colloquy defective if it informs the parent of the best interest[s] standard but miscommunicates the burden of proof it is required to apply at disposition?

2) Did the circuit court improperly rely on the adoptive parent's assurance that she would allow B.W. to continue to visit with his son in deciding to terminate his parental rights?

¶3 B.W. argues that the plea colloquy is defective because the circuit court miscommunicated that a clear, satisfactory, and convincing burden of proof applied not only to the grounds phase but also to the disposition phase. He argues that the burden of proof is a trial right and when the court described B.W.'s rights at the grounds phase and then incorrectly advised B.W. that he would have "all those same trial rights" at disposition, the court misinformed him that this heightened burden of proof, rather than the "best interests of the child" standard, would apply at disposition. B.W. argues

---

[1] The Honorable Ellen R. Brostrom presided over B.W.'s plea and dispositional hearing and entered the orders terminating B.W.'s parental rights. The Honorable Joseph R. Wall presided over B.W.'s post-disposition motion hearing and issued the orders denying the motion.

2

that because of this miscommunication, he was not properly advised about the potential ramifications of pleading no contest to grounds. In other words, B.W. avers that the court misadvised that the State would be held "to the higher burden of proof that termination was clearly and convincingly in his son's best interest." B.W. also argues that at disposition, the circuit court improperly relied on the proposed adoptive parent's assurance that she would allow B.W. to continue to visit and "co-parent" Bob.[2]

¶4 We conclude that B.W. failed to make a prima facie showing that the plea colloquy was defective. At the plea hearing, the circuit court properly informed B.W. that the prevailing factor at disposition is the statutory standard: "The best interests of the child." Wis. Stat. § 48.426(2) (2021-22).[3]

¶5 We also conclude that at disposition, the circuit court did not erroneously exercise its discretion by relying on the proposed adoptive parent's testimony that post-termination, she would allow B.W. to continue to visit with Bob and that they would "co-parent." The court did not fail to consider that this testimony was an "unenforceable promise," nor did the court "hinge" termination on this testimony. The circuit court

---

[2] "Bob" is a pseudonym which the court of appeals used in referring to B.W.'s son, since B.W. and his son share the same initials. For sake of consistency and clarity, we will likewise use "Bob" to refer to B.W.'s son in this opinion.

[3] All subsequent references to the Wisconsin Statutes are to the 2021-22 version unless otherwise indicated.

properly exercised its discretion, considering the testimony and weighing the statutory dispositional factors of Wis. Stat. § 48.426(3).

¶6 Accordingly, we affirm the decision of the court of appeals.[4]

I. FACTUAL BACKGROUND AND PROCEDURAL POSTURE

¶7 Termination of parental rights ("TPR") cases, governed by the Wisconsin Children's Code, Wis. Stat. ch. 48, follow a bifurcated procedure. At the initial stage, the grounds phase, it is the State's burden to prove the grounds by clear and convincing evidence.[5] Wis. Stat. § 48.31; see also Evelyn C.R. v. Tykila S., 2001 WI 110, ¶¶21-22, 246 Wis. 2d 1, 629 N.W.2d 768; Waukesha Cnty. Dep't Soc. Servs. v. C.E.W., 124 Wis. 2d 47, 60, 368 N.W.2d 47 (1985). If "grounds" are proven, then the court proceeds to the dispositional stage. At the dispositional phase, "the best interests of the child" shall be the prevailing factor. Wis. Stat. § 48.426(2); Evelyn C.R., 246 Wis. 2d 1, ¶23; State v. Margaret H., 2000 WI 42, ¶¶33-34, 234 Wis. 2d 606, 610 N.W.2d 475. In considering the best interests

___

[4] We decline to address the burden of proof issue in the majority opinion.

[5] We recognize that Wis. Stat. § 48.31 uses the language "clear and convincing evidence" to describe the State's burden of proof at the grounds phase. We also recognize that the circuit court consistently used the language "clear, satisfactory, and convincing" when describing that same burden. No challenge is being made to the court's use of "satisfactory." For purposes of this opinion, we use the "clear and convincing" language when referring to the statute, and the language the court used when quoting the circuit court.

4

of the child, "the court shall consider <u>but not be limited to</u>" (emphasis added) the following factors:

> (a) The likelihood of the child's adoption after termination.

> (b) The age and health of the child, both at the time of the disposition and, if applicable, at the time the child was removed from the home.

> (c) Whether the child has substantial relationships with the parent or other family members, and whether it would be harmful to the child to sever these relationships.

> (d) The wishes of the child.

> (e) The duration of the separation of the parent from the child.

> (f) Whether the child will be able to enter into a more stable and permanent family relationship as a result of the termination, taking into account the conditions of the child's current placement, the likelihood of future placements and the results of prior placements.

Wis. Stat. § 48.426(3)[6]

¶8 The State filed a TPR petition seeking to terminate B.W.'s parental rights to Bob. In its petition, the State alleged two grounds for termination: (1) that Bob was a child in continuing need of protection or services ("CHIPS"), and (2) that B.W. failed to assume parental responsibility. The State alleged that B.W. failed to comply with the conditions of return for Bob, including but not limited to, a failure to attend mental health appointments, control his substance use disorder, obtain stable housing arrangements, and be consistent with visitation. The State also referenced numerous reports to Child Protective Services ("CPS"), over a four-year span, which alleged that B.W. and Bob's mother were engaged in repeated domestic violence incidents and ongoing drug use. In sum, the State alleged that B.W. had "still not addressed the issues that resulted in [Bob's] removal." The State sought to place Bob with the proposed adoptive parent, with whom B.W. shared another child.

---

[6] See, e.g., State v. Margaret H., 2000 WI 42, ¶15, 234 Wis. 2d 606, 610 N.W.2d 475 (agreeing with court of appeals' decision to remand, notwithstanding its erroneous statutory interpretation, because "the record indicates that the circuit court failed to consider all of the relevant statutory factors enumerated under Wis. Stat. § 48.426(3)") (emphasis added); Sheboygan Cnty. Dep't Health & Human Servs. v. Julie A.B., 2002 WI 95, ¶4, 255 Wis. 2d 170, 648 N.W.2d 402 (concluding that the court "must consider . . . the six factors enumerated in § 48.426(3) in determining the best interests of the child" but "the court may also consider other factors . . . but all factors relied upon must be calibrated to the prevailing standard: the best interests of the child").

¶9    The circuit court held an adjourned initial appearance on the State's TPR petition.  The court explained the bifurcated TPR procedure to B.W.:

> In the first half, the court answers the basic question, is there a legal reason, or what we call a ground, to terminate your parental rights? If that question is answered "yes," then we get to the second half where the court answers the question, is it in [Bob's] best interest that the court actually terminate your parental rights?
>
> And in each of those halves, you can agree or disagree, you have a right to a trial. So--
>
> [B.W.]:  Okay.
>
> THE COURT:  --turning back to that first half of the case where the court answers the basic question, is there a legal reason to terminate your parental rights, as I indicated, if you disagree that there is a reason to terminate your parental rights, you have a right to a trial about that.
>
> . . .
>
> [W]hether you choose the trial to me the judge or the jury, it's the State that has to prove by clear, convincing, and satisfactory evidence to a reasonable certainty that there is a reason to terminate your parental rights.
>
> The State would try to do that by calling witnesses to the stand. You would have a right to cross-examine them.  You would have the right to introduce your own evidence. You would have the right to use subpoenas to require witnesses to come to court and testify on your behalf. And you have the right to testify yourself or choose to remain silent. . . .
>
> So assuming for purposes of this explanation that it is found there is a legal reason or a ground to terminate your parental rights, as I said, then we would move to the second half, where the court would have to decide whether that's actually in [Bob's] best

7

interest. Again, you could have a trial about that if you disagree.

Now, there's no right to a jury trial in the second half. It's always just a trial to the judge, but all those same trial rights would rise up again. So it's the State that would have to prove by clear, convincing, and satisfactory evidence that it's in [Bob's] best interest that the court terminate your parental rights.

And, again, it would be [a] process with witnesses on the stand. You would have the right of cross-examination. You would have the right to introduce your own evidence. You would have the right to require witnesses to come to court and testify for you. And you could testify also testify [sic] or, again, remain silent, again, knowing silence could be used against you.

(Emphasis added.) The circuit court then set future court dates for the matter.

¶10 Several months later, B.W. pled no contest to the grounds phase of the TPR. At this plea hearing, the circuit court advised B.W.:

THE COURT: Now, you understand that nobody can force you to plead no contest to the grounds phase in this case, right?

[B.W.]: Yes, ma'am.

THE COURT: You have an absolute [right] to a trial. It could be a jury trial which we have set next week, or it could be a trial just to the Judge. Do you understand that?

[B.W.]: Yes, ma'am.

. . .

THE COURT: But either way, it's the State's burden to prove by clear, convincing, and satisfactory evidence to a reasonable certainty that the grounds exist. And the State would try to do that by calling

8

witnesses to the stand. They would testify under oath. You would have a right to cross-examine them, and the right to introduce your own evidence. The right to use subpoenas to require witnesses to come to court and testify for you. Also the right to testify yourself or remain silent knowing silence can be used against you.

Do you understand that by pleading no contest you're giving up all those trial rights to the first half of the case?

[B.W.]: Yes, ma'am.

THE COURT: Now, that does not mean you're giving up your trial rights to the second half of the case. And that's what we call disposition. And at that hearing, the Court would have to decide if it's in the child's best interest to actually terminate your parental rights. Does that make sense?

[B.W.]: Yes, ma'am.

THE COURT: And at all those same trial rights then you would have again in the second half [sic], it's just a trial to the Judge in the second half. Does that match your understanding?

[B.W.]: Yes.

(Emphasis added.)

¶11  The court then explained:

Now, assuming I accept your no contest plea as knowing, intelligent, and voluntary, I will then take some brief testimony to make sure there's [a] factual basis for it. And then by statute I will be required to find you unfit as a parent as to [Bob]. Do you understand I'll have to make that finding?

[B.W.]: Yes.

THE COURT: However, if I do not terminate your parental rights, if I do not find that to be in [Bob's] best interest, the termination of parental rights petition will be dismissed, and that unfitness finding will be reversed or vacated, okay?

9

[B.W.]: Yes, ma'am.

THE COURT: Now, at that second half of the case, the disposition, I basically have two choices. Either I find it's in [Bob's] best interest to terminate your parental rights, and I do so. Or I do not find that, and I dismiss the TPR petition. Does that make sense?

[B.W.]: Yes, ma'am.

¶12 The court verified that B.W. was not threatened or coerced into entering his no contest plea. B.W.'s attorney also advised the court that he believed that the plea was being made knowingly, intelligently, and voluntarily. The court found that B.W. was knowingly, intelligently, and voluntarily pleading and set a date for the next proceeding.

¶13 The court then held a "prove-up"[7] to grounds hearing, at which B.W. and his counsel, the guardian ad litem ("GAL"), and Bob's former and current case managers attended. The court heard testimony from Bob's former case manager which supported the "grounds" determination. The case worker testified about

---

[7] When, as in this case, a parent pleads no contest to the grounds in the TPR petition, the court "shall hear testimony in support of the allegations in the petition." Wis. Stat. § 48.422(3). This hearing is commonly referred to as a "prove-up."

10

previous interactions with B.W. while Bob was in his care, and the services that were made available to B.W.[8]

¶14 Before the court made its findings for the grounds phase, it first addressed B.W. and encouraged B.W. to continue to progress dealing with "the really hard circumstances" of the death of a child, death of his mom, homelessness, and drug addiction, in addition to his service-related PTSD. The court stated:

> So, you know, I just want to let you know, I have [to] make my findings that the State has proven the grounds, but I just want to express my compassion to you and my respect to you for your service to our country.
>
> [B.W.]: Thank you.
>
> THE COURT: You're welcome. So, I do think that the testimony does provide clear, convincing and satisfactory evidence of the grounds at issue here.

¶15 The court concluded that grounds were proven: "[Bob] is a child who has been adjudged to be in need of protection or

---

[8] In her testimony, the case manager testified to the unsafe conditions which necessitated Bob's removal from B.W.'s care. The case manager also testified to the variety of services they provided B.W. after Bob's removal, including parenting assessments, AODA assessments, random urinalysis, psychological evaluation, home management and case management. According to the case manager's testimony, B.W.'s level of participation in the provided services was sporadic. The case manager also testified to B.W.'s ongoing struggles to comply with the conditions of return. The case manager's concerns included, among other things, B.W.'s refusal to manage and address his own mental health diagnoses; B.W.'s inconsistency in visitation; B.W.'s difficulty meeting Bob's diagnosed PTSD-related mental health needs; and B.W.'s failure to provide Bob with a safe and clean home, given B.W.'s frequent experiences with bouts of homelessness and housing instability.

services and placed outside the of the home for cumulative period of 6 months or longer pursuant to one or more court orders containing the termination of parental rights notice required by law." Wis. Stat. § 48.415(2)(a)1. The court also found that while B.W. had "made a little bit more progress," CPS "made reasonable efforts" to provide the services ordered by the court and that B.W. "failed to meet the conditions established for Bob's safe return." § 48.415(2)(a)2.a.-b. Finally, the court found that due to B.W.'s failure to meet the conditions established for Bob's safe return, Bob had been placed outside of the home for 15 of the past 22 months. § 48.415(2)3. The court found B.W. unfit to parent. Accordingly, the court concluded that the State had proven grounds for TPR by clear, satisfactory, and convincing evidence."[9]

¶16 Later that month, the court began the dispositional hearing phase. Including B.W., six witnesses testified at the dispositional hearing. Three witnesses testified on behalf of the State: the case manager, the former case manager, and the proposed adoptive parent for Bob. Three witnesses testified on behalf of B.W.: the supervised visitation worker, B.W.'s grandmother, and B.W.

¶17 The proposed adoptive parent, D.D., testified first. D.D. is Bob's foster parent and he lives with her. D.D. and B.W. are also the biological parents of another child, who lives with D.D. As a result, B.W. and Bob have contact. D.D.

---

[9] See ¶7 n.5, supra.

explained that before Bob was placed with her two years prior, she frequently saw Bob for holidays and overnight visits. D.D. testified that Bob got along with her two other children, and since being placed with her, his behavior patterns had improved. D.D. further testified that she would like to adopt Bob. The State asked how D.D. would feel about continuing contact between Bob and Bob's sibling and B.W.'s grandmother, if the court granted termination of parental rights. D.D. expressed that the continued contact would be "totally fine."

¶18 D.D. affirmed that since Bob was placed in her care, she and B.W. "talk a bit." She stated that B.W.'s contact with Bob had been sporadic, but that B.W. had recently been more consistent, "call[ing] almost every day." D.D. also testified that unlike Bob's birth mother, Bob "absolutely" talked a lot about B.W. Counsel for the State asked D.D.:

> If the Court were to grant the termination petition today, have you given any thought as to what your position would be for further contact between [Bob] and [B.W.]?
>
> [D.D.] I would still expect him to be in full contact.
>
> [Counsel for State] At this point do you feel as though you have a positive relationship with [B.W.]?
>
> [D.D.] I think so.
>
> [Counsel for State] Is that something that is important to you?
>
> [D.D.] It is.

¶19 When questioned by the GAL, D.D. shared that she "absolutely" respected the role B.W. had in Bob's life and their

13

relationship of father and son.  D.D. reiterated that the relationship between B.W. and Bob could continue "as long as it's safe, [it would be] fine."

¶20  Next, the court heard from Bob's former case manager. The case manager testified that she had conversations with D.D. "about her willingness to be a long-term adoptive resource for [Bob]" and that D.D. "was willing because [Bob] was her daughter's half sibling."  The case manager also testified to observing Bob in D.D.'s home, that Bob "fits in really well" and "has a lot of playmates" with the other children in D.D.'s care, including his half-sister, and that Bob "appear[ed] bonded" to D.D., referring to D.D. as "mom."  The case manager acknowledged that if the court were to terminate B.W.'s parental rights, it was "highly likely" that D.D. would adopt Bob.

¶21  The case manager also testified about Bob's health and condition at the time of his removal from B.W.'s care.  She stated that he "ha[d] some behavioral concerns when the case first came in" including a "preoccupation with death, killing" so he was referred for a neuropsychological assessment.  She said that Bob's PTSD "was related to past trauma or things he had witnessed within his home environment" such as the death of his grandmother from a drug overdose, and the death of his baby sister.  She said Bob was placed in play therapy after the PTSD diagnosis and continued to show improvement.  The case manager stated that D.D. "had an understanding of what [Bob's] mental health needs were," was "supportive" in providing Bob the treatment he needed, and that she had no concerns about D.D.'s

14

ability to meet Bob's medical or mental health needs going forward.

¶22 The case manager testified that severing Bob's relationship with his great-grandmother would not cause him any harm. She noted that the relationship was not substantial and "he would still have contact and be able to see her." The case manager testified that no harm would be caused to Bob by severing the relationship to his biological mother, as Bob's biological mother informed the case manager that "she didn't want to have anything to do with the court and she stopped her relationship with Bob."

¶23 When asked about Bob's relationship with B.W., the case manager acknowledged that B.W. struggled to maintain consistent contact with Bob, which the case manager attributed to B.W.'s "drug and alcohol usage." B.W.'s inconsistency in visitation "really upset [Bob]" who would "become angry if [B.W.] wasn't present when [Bob] thought he should be there." While the case manager said that Bob's relationship with B.W. was "substantial," she "[didn't] believe there would be harm if the legal relationship were severed because [she] believes that he will see [B.W.] outside of a legal relationship." She observed that B.W. and D.D. "share a child who [B.W.] sees on a regular basis as well, and so I know that [D.D.] wants the children to see and know their dad. So I believe that [B.W.] would be able to see the kids consistently." The case manager testified that termination would be in Bob's best interests because it would allow him to "enter into a more stable and

15

permanent family relationship" as Bob "craves stability." She said Bob "talks a lot about wanting to go home and being with [B.W.]" but when B.W. failed to keep his promises, Bob would "become upset" and "get mad" and "want to stay with D.D." The case manager believed that Bob "truly wanted to be in a family where he knows that he's not going to go anywhere." The case manager recognized that B.W. "[was] on the right track and he's trying to make changes in his life." However, he "has a longstanding history of substance abuse and drug use so I feel that there would be a lot more work that still needs to be done."

¶24 Bob's current case manager then testified regarding ongoing efforts with B.W. to obtain stable housing, to facilitate in-home visits, and B.W.'s participation in post-treatment programs. She also testified that B.W. would have to make significant progress to move to unsupervised visits with Bob.

¶25 B.W. first called the visitation worker to testify. The visitation worker testified that B.W. had "been progressing over time" in terms of completing his VA program and obtaining his own apartment, and that her overall summation was that "things were progressing and going as they should be." On cross-examination, however, the visitation worker admitted that she had never actually been assigned to supervise a visit between B.W. and Bob, and that she had to rely instead on notes from another supervised visitation worker.

16

¶26 B.W.'s second witness was B.W.'s grandmother. B.W.'s grandmother testified to letting Bob stay at her house and "taking care of him when [B.W.] was at his darkest." She testified that she at one point "no longer had contact" with B.W., because "he was on drugs and I wouldn't allow him in my home anymore." She also pointed out that she had "seen a change" in B.W. over the last year, that he "realized it . . . was time for a change." B.W.'s grandmother also testified to having a "cooperative" relationship with D.D., and that she "would be willing to be a guardian, work in a guardian-type position with [Bob]" or "share placement" if the court allowed it. She also testified that she felt she could work with B.W. and D.D. to raise Bob, commending B.W. for his progress and D.D. for the "positive relationship" she had with her.

¶27 Finally, B.W. took the stand. B.W. testified to his participation in residential rehabilitation treatment and other parenting and anger management groups. He stated he participated in those groups "[b]ecause I needed to get my life together." B.W. also testified that he would "love to get [Bob] back, love to be the father for him that I know I can be, just be there for him on an emotional level and physical." B.W. would be willing to have his grandmother be Bob's guardian while he continued to improve. On cross-examination however, B.W. admitted that he had been "diagnosed with alcohol dependence, cocaine dependence, opioid dependence, and cannabis abuse" and that he had had "four accidental overdoses." B.W. likewise

17

admitted D.D. "provided a stable, secure home for [Bob]" while "helping" Bob work though his struggles.

¶28 After the testimony was concluded, the State asked the court to grant its petition for termination of B.W.'s parental rights. In its closing argument, the State said that it "[took] no pleasure in making the request," but the State nonetheless acknowledged that it was its obligation "to assess and argue for what is in [Bob's] best interests, and [the State thinks] termination is." The State reminded the court that "there is a ton of evidence about how chaotic [Bob's] life was prior to his removal" from B.W.'s care, including exposure to death, domestic violence, drug use, homelessness, and other unsafe conditions. Among other things, the State argued that if Bob's relationship to B.W. were severed by the court granting termination and D.D. adopting, that "when the Court looks in terms of balancing the nature of the substantial relationship against the risk of harm, [Bob is] not going to be harmed if the Court legally severs that relationship." Finally, the State pointed to the fact that "as long as [B.W.] stays sober and healthy and appropriate, I think [D.D.'s] testimony that she would continue to facilitate that contact was very credible," and that D.D. had "continued to facilitate that contact [with Bob] outside of case management's direct involvement." In "looking at the totality of the case [and] looking at all the factors," the State argued stability and permanency "very strongly weigh[] in favor of TPR and adoption in this case."

18

¶29 The court continued the disposition hearing to another date, a couple weeks later, for the remaining closing arguments. The GAL argued for TPR and adoption as being in Bob's best interests. While the GAL recognized "B.W.'s success in AODA treatment," she nonetheless recommended termination of parental rights instead of a guardianship. She reminded the court of the "horrific circumstances that existed at the time of [Bob's] detention" and Bob's subsequent CHIPS——that Bob's baby sister died in Bob's parents' care in a hotel room, a hotel room in which responding law enforcement found weapons and drugs, as well as Bob and his incapacitated parents. The GAL argued that Bob "needs permanence and stability with the current placement where he has been nurtured and has found stability and believes to be a safe place." The GAL also argued that Bob's best interests should be paramount even to B.W.'s commendable progress with treatment, and that whatever progress was made was "too recent to take a chance with Bob's life and mental health." Finally, in addressing the concerns about B.W. and his relationship with Bob, the GAL stated:

> [I do not] believe it's going to be harmful to sever the relationship because the foster parent does have a child with [B.W.] and has a long track record of allowing contact with that child and [B.W.]. Then [Bob] will be a part of that picture. That relationship will still exist, and there's no evidence to indicate she would not allow it as long as it is safe and stable.
>
> Legal severance I don't believe will be harmful to [Bob] for that reason. If TPR is not granted, reunification is not imminent. [Bob] needs permanency and stability now . . . .

19

¶30 The court then heard closing argument from B.W.'s attorney, who argued that her client had "demonstrated the complete commitment that [B.W.] has had to changing his life," and that the court should recognize that "what we do . . . is to give parents opportunities to reunite with their children if they're worthy." She argued that it was "clearly in the best interest of the child that [B.W.] be allowed to maintain his parenting status," because B.W. took anger management classes and participated in mental health and drug addiction treatment programs. Finally, B.W.'s attorney argued for dismissal because "there are alternatives to terminating his parental rights." She suggested "[p]erhaps a shared guardianship or a temporary guardianship" with D.D. and B.W.'s grandmother so that [B.W.] "could prove over time to the Court that he can maintain his sobriety, that this is not just something that he's done temporarily, but rather a permanent change."

¶31 On rebuttal, the State argued that doing anything short of TPR in this case was "concerning":

> [I]n my opinion, [anything short of TPR would not be] in [Bob's] best interest because the uncertainty and the safety concern that kind of circles around with is there going to be another relapse, am I going to have to go back to a situation of housing instability or drug use, those unanswered questions remain if the Court does anything short of termination.
>
> If the Court chooses to grant the State's petition as requested, [Bob] knows where he's going to be. He's going to be in a place that is safe no matter what, no matter if people make promises to him or don't make promises to him, he's safe and secure in a home he's thriving in.

20

¶32 The State further expressed concern that "recovery is a process," so while the State "[didn't] want to diminish the progress [B.W.] made," he was still nonetheless "on a path to recovery" and susceptible to relapse. The State concluded by reminding the court that it's "focus today has to be on what is in [Bob's] best interest as opposed to [B.W.'s] best interest."

¶33 After closing arguments, the circuit court recognized that this was a case that had "a long history of parental drug use and then a parent who is solid in recovery by the time we get to disposition are really hard." The court acknowledged B.W.'s progress in a variety of areas,[10] and stated:

> And so it's hard because I want to affirm that, but today's hearing is not about affirming that progress solely, it's also about what [Bob] needs, and [Bob] needs continued stability.
>
> Of course, relapse is always a potential. I'm not saying that I think that that what's going to happen, but also what [Bob] doesn't need is for continued uncertainty about where he's going to be, what's his home, who is he going to live with.

¶34 Reiterating its concern that Bob needed "stability," the circuit court stated that it "strongly consider[ed] transfer of guardianship to [D.D.]" but that doing so would keep Bob "in a position for continued litigation, for continued conversations about different configurations of his life." The court concluded that Bob's PTSD diagnosis

---

[10] The court referenced B.W.'s progress, that he had not used drugs for over five months, was engaged in recovery support and aftercare programs, had a full-time job, and had repaired the relationship with his grandmother.

21

is really significant. And . . . it leaves a long destructive wake . . . in its path. Even after one gets to the point of recovery that you are, that destructive path continues to sort of unfold. It has a momentum.

. . .

[A]nd I just really think that Bob needs . . . the stability.

¶35 The court further recognized:

[G]iven that you [B.W.] and [D.D.] have a child in common, you guys already coparent, I'm trusting that you guys will continue to do so. And as you continue with your stability and sobriety, the further you get into that the safer you'll be for overnight visits, for really meaningful coparenting even if the legal relationship is severed, and I found [D.D.'s] testimony to be credible that she would do that.

¶36 The court continued:

So in terms of my findings . . . Bob is likely to be adopted post termination. [D.D.] is licensed and committed. At the time of removal, [Bob] was not in good mental health, given the really difficult experiences that he had. Today he's still working through those experiences, but overall he is thriving, and that's an important thing that the Court doesn't want to disrupt. He doesn't seem to have any medical issues.

I think he does have a substantial relationship with you, [B.W.]. I don't think he has a substantial relationship with the mother or any extended family members. He certainly knows his great grandmother, but I don't think the contact was extensive . . .

. . .

There's always some harm in severing legal relationships, but I think that harm will be mitigated by the coparenting circumstances that I've just described. [Bob's] wishes are complex as can be understood, but he certainly is bonded with [D.D.]. He is living with his half-sibling. He's thriving in

22

that home, and he has recognized those benefits. He has been separated from his parents since 2019, so a significant chunk of his young life. And most fundamentally, it's the stability and permanency that the Court is seeking in makings its decision today.[11]

¶37 The court concluded, "I do order the termination of the parental rights . . . ." After ordering the termination, the court addressed B.W. and stated:

> I will tell you, [B.W.], I agonized over this decision considerably, and this was not an easy decision. This was a close call, but in the end I really think that [Bob's] need for stability is paramount, and as you continue to do well, I trust that you and [D.D.] will do the right thing for [Bob] to continue to have a relationship with you.
>
> . . .
>
> I just hope and pray that this adverse decision doesn't knock you off your sobriety path.

¶38 B.W. filed a post-disposition motion to withdraw his no contest plea to grounds for termination. Specifically, B.W. asserted that the plea colloquy was deficient and his no contest plea "was not knowing, intelligent, and voluntary because the court failed to properly explain the statutory standard it would apply at disposition during the plea hearing." In his motion, B.W. argued:

---

[11] The court considered each of the statutory factors as required under Wis. Stat. § 48.426(3) in making its requisite findings, namely: Bob's likelihood of adoption by D.D., see § 48.426(3)(a); Bob's age and health at disposition, see § 48.426(3)(b); Bob's substantial relationship with B.W., see § 48.426(3)(c); Bob's wishes to live with B.W. or D.D. see 48.426(3)(d); how long Bob had already been separated from his birth parents, see § 48.426(3)(e); and Bob's stability and permanency interests, see § 48.426(3)(f).

23

[B]ecause the court told [B.W.] that he had the same rights at disposition that he had during the grounds phase at the []plea hearing in this matter, the court informed [B.W.] that the State would have to demonstrate by "clear, convincing, and satisfactory evidence to a reasonable certainty" that termination of [B.W.'s] parental rights was appropriate.

¶39 B.W. argued that "[t]he court's explanation improperly described the statutory standard which it was required to rely on at disposition, as the statutory standard was what was in [Bob's] best interests and not whether there was proof by clear and convincing evidence that termination was in [Bob's] best interests." Finally, B.W. claimed the circuit court also misadvised him of the statutory standard it would rely on at disposition during the adjourned initial appearance, because the court told B.W. at that hearing that "it's the State that would have to prove by clear, convincing, and satisfactory evidence that it's in [Bob's] best interest that the court terminate your parental rights." B.W. argued that since the circuit court "did not explain to B.W. that his son's best interests" were the "driving factor," the "most important factor," or even the "prevailing" factor at disposition, B.W. did not know that the circuit court would base its decision at disposition "primarily on what it found was in B.W.'s son's best interest," so B.W. was entitled to an evidentiary hearing on his motion to withdraw his no contest plea.

¶40 A different circuit court judge held a hearing on B.W.'s post-disposition motion. The court reviewed the transcript and permitted both parties to make arguments on the sufficiency or deficiency of the plea colloquy. At the

24

conclusion of the arguments, the court noted that the circuit court judge who took the plea had repeatedly

> referenc[ed] the correct standard, that being just the best interests of the child. So that's a very -- I think that's a very direct reference as to what the standard is, despite what might have been in [the judge's] head, and we're not going to look into what her thought process is or what she actually believed was to happen at disposition. Rather, it's what she communicated to [B.W.] here.

¶41 The court found that the circuit court judge who took the plea had affirmatively referenced the best interests of the child standard at the plea hearing:

> We have not even a direct statement by the judge to [B.W.] that, when we get to disposition, the State [will] have to prove by clear and convincing evidence that termination of your rights is in in your child's best interest. . . . [S]he says it in a more oblique way, not directly at all, and then as I've referenced here . . . she emphasizes, "we're talking about the best interests of the child at the dispositional hearing." And I think, in looking at the standard here and what [B.W.] needs to show, and considering that the rest of the plea colloquy was appropriate, and there was no other error in the plea colloquy, other than, again, this oblique reference to what [B.W.] may have at the dispositional hearing, I do not find that [B.W.] has met his burden to show that there was evidence here that he did not understand what was being said to him at the plea colloquy.

¶42 The court concluded that the plea colloquy was sufficient and didn't "think there [was] anything here that rises to the point of really confusion or mixing up the burdens or overlapping the burden from the grounds phase to the best interests phase," but that the court's "emphasis here on best interests at disposition was clear enough." The court

25

determined that B.W. failed to make a prima facie showing that his no contest plea was not knowing, intelligent, and voluntary, and denied B.W.'s motion.

¶43 B.W. appealed.[12] On appeal, B.W. also raised a second issue: "Did the circuit court erroneously exercise its discretion in finding that termination of B.W.'s parental rights was in his son's best interests when it inadequately considered whether severance of their relationship would be harmful?" The court of appeals affirmed the circuit court's conclusion that B.W. failed to meet his prima facie burden and was not entitled to an evidentiary hearing nor to withdraw his plea. Highlighting the circuit court's plea colloquy in the record, the court of appeals concluded:

> Thus, the record reflects that the circuit court did not advise B.W. during the plea hearing that the State would have to demonstrate by clear, convincing, and satisfactory evidence that termination of B.W.'s rights was appropriate at the dispositional hearing. Rather, the circuit court simply advised B.W. that the court would have to decide whether it was in the child's best interest to terminate B.W.'s rights. This complies with the statutory requirement set forth in Wis. Stat. § 48.426(2).

B.W., No. 2022AP1329, at ¶17.

¶44 The court of appeals further stated:

> At no point, however, did the circuit court describe the State's burden in the grounds phase as a "right."

---

[12] The court of appeals stayed its decision pending this court's decision in State v. A.G., 2023 WI 61, 408 Wis. 2d 413, 992 N.W.2d 75. After ordering supplemental briefing from the parties following the decision's release, the court of appeals then issued its ruling affirming the circuit court's decision.

The court stated that B.W. "would have a right to cross-examine [witnesses]," "the right to introduce your own evidence," "the right to use subpoenas," and "the right to testify yourself or remain silent." As a result, based on the record, I am not persuaded that the circuit court misadvised B.W. during the plea colloquy regarding the standard that would be applied at the dispositional hearing.

Id., at ¶19.

¶45 The court of appeals concluded that the record did not reflect that the circuit court advised B.W. during the plea hearing "that the State would have to demonstrate by clear, convincing, and satisfactory evidence that termination of B.W.'s rights was appropriate at the dispositional hearing." Id., at ¶17. Instead, the court of appeals determined that the circuit court "simply advised B.W. that the court would have to decide whether it was in the child's best interest to terminate B.W.'s rights" and that this colloquy "complie[d] with the statutory requirement set forth in Wis. Stat. § 48.426(2)." Id.

¶46 Regarding B.W.'s argument that the circuit court erroneously exercised its discretion in relying on the adoptive parent's testimony, the court of appeals relied on Margaret H., 234 Wis. 2d 606. In Margaret H., this court concluded that "[i]n its discretion, the [circuit] court may afford due weight to an adoptive parent's stated intent to continue visitation with family members." 234 Wis. 2d 606, ¶29. The court of appeals determined that B.W. "does not identify any language in the record indicating that the circuit court incorrectly believed that D.D.'s promise was legally enforceable." B.W.,

27

No. 2022AP1329, at ¶27.  B.W. petitioned this court for review, which we granted.

## II.  STANDARD OF REVIEW

¶47 The court generally employs the plea withdrawal framework from criminal law cases to plea withdrawals in TPR cases.  See Waukesha Cnty. v. Steven H., 2000 WI 28, ¶42, 233 Wis. 2d 344, 607 N.W.2d 607 ("In prior cases the analysis set forth in State v. Bangert, 131 Wis. 2d 246, 274-75, 389 N.W.2d 12 (1986), relating to a circuit court's acceptance of a guilty plea in a criminal case, has been used to evaluate a challenge to the proceedings mandated by Wis. Stat. § 48.422."). "A plea not entered knowingly, voluntarily, and intelligently violates fundamental due process, and a defendant therefore may withdraw the plea as a matter of right."  State v. Cross, 2010 WI 70, ¶14, 326 Wis. 2d 492, 786 N.W.2d 64 (quoting State v. Brown, 2006 WI 100, ¶19, 293 Wis. 2d 594, 716 N.W.2d 906). Whether B.W. knowingly, voluntarily, and intelligently entered a no contest plea presents a question of constitutional fact that this court reviews independently.  Brown, 293 Wis. 2d 594, ¶19 (citing State v. Trochinski, 2002 WI 56, ¶16, 253 Wis. 2d 38, 644 N.W.2d 891).  Whether B.W. has shown that the plea colloquy was deficient such that the circuit court violated its duty under Wis. Stat. § 48.426 is a question of law that this court reviews independently.  Id., ¶21.  Whether B.W. has presented a prima facie case by pointing to deficiencies in the plea colloquy and sufficiently alleging that he did not know or understand information that should have been provided in the

28

colloquy is a question of law we review independently.  Oneida
Cnty. Dep't of Social Servs. v. Therese S., 2008 WI App 159, ¶7,
314  Wis. 2d 493,  762  N.W.2d 122.  Generally,  with  plea
withdrawal motions alleging a defect in the plea colloquy, the
violation "should be  apparent  from  the  record."  State  v.
Hampton, 2004 WI 107, ¶61, 274 Wis. 2d 379, 683 N.W.2d 14.  "We
accept  the  circuit  court's  findings  of  historical  and
evidentiary  facts  unless  they  are  clearly  erroneous  but  we
determine independently whether those facts demonstrate that the
defendant's  plea  was  knowing,  intelligent,  and  voluntary."
Brown, 293 Wis. 2d 594, ¶19.

¶48  "We decide any questions of law which may arise during
our  review  of  an  exercise  of  discretion  independently  of  the
circuit  court  and  court  of  appeals."  LeMere  v.  LeMere, 2003 WI
67, ¶14, 262 Wis. 2d 426, 663 N.W.2d 789 (quoting King v. King,
224  Wis. 2d 235,  248-49,  590  N.W.2d 480  (1999)).  But  "the
analyses  of  the  circuit  court  and  the  court  of  appeals  benefit
us in our independent review."  Id.

### III.  ANALYSIS

¶49  B.W.  argues  to  this  court  that  because  the  circuit
court's  plea  colloquy  was  defective,  he  is  entitled  to  an
evidentiary  hearing  of  his  motion  to  withdraw  his  no  contest

plea.[13] For purposes of making his prima facie showing that the circuit court violated its mandatory duties, B.W. asserts that

_____

[13] Counsel for B.W. acknowledged at oral argument that, for purposes of making a prima facie case, the focus must be on the circuit court's alleged mistake in the plea colloquy provided at the plea hearing, not the circuit court's statements at the initial appearance. However, counsel for B.W. argues that the circuit court's statements from the initial appearance were problematic as well, and further bolster B.W.'s "reasonable interpretation of the record" which helps make B.W.'s prima facie case. According to B.W.'s counsel at oral argument,

> I think the fact that the court also made this mistake at the initial appearance adds to the reasonableness of that assessment and the push toward him making a prima facie case. At the end of the day I understand that the actual mistake has to happen at the plea colloquy, and for the reasons here I do think that that mistake did take place.

Oral argument in State v. B.W., No. 2022AP1329, held Mar. 19, 2024, available on WisconsinEye https://wiseye.org/2024/03/19/wisconsin-supreme-court-state-v-b-w/ (argument of Attorney Chris Sobic, at 27:40).

The State "acknowledges that the trial court did misadvise B.W. at the initial appearance," but contends that "this same error was not repeated during the plea colloquy" and "expansion beyond the actual plea colloquy . . . would cause absurd results."

Even assuming the initial appearance language is incorrect, the plea colloquy exchange is what we review to determine whether the plea colloquy is sufficient and complies with the statute. See, e.g., State v. Bangert, 131 Wis. 2d 246, 274-75, 389 N.W.2d 12 (1986); Waukesha Cnty. v. Steven H., 2000 WI 28, ¶¶42-44, 233 Wis. 2d 344, 607 N.W.2d 607; State v. Negrete, 2012 WI 92, ¶19, 343 Wis. 2d 1, 819 N.W.2d 749; see also A.G., 408 Wis. 2d 413, ¶41 (Hagedorn, J., concurring) (citing State v. Clark, 2022 WI 21, ¶¶13-16, 401 Wis. 2d 344, 972 N.W.2d 533) ("[A] prima facie showing will generally focus on the plea colloquy itself to determine whether certain requirements were not followed.").

the plea colloquy was defective because the circuit court "miscommunicated to B.W. that there was a burden of proof at disposition." B.W. argues that he is entitled to an evidentiary hearing at which the State would have the burden to prove that B.W.'s no contest plea was nonetheless entered knowingly, intelligently, and voluntarily. B.W. also alleges that the circuit court erroneously exercised its discretion at disposition because it "improperly relied on the adoptive parent's assurance that she would allow B.W. to continue to visit with his son in deciding to terminate his parental rights."

¶50 The State contends that the circuit court's plea colloquy with B.W. "was not defective because it never mentions any burden of proof at disposition," so "B.W. was not misadvised" at the plea hearing. The State asserts that B.W. failed to make a prima facie case showing that his plea was not knowing, intelligent, and voluntary. Finally, the State dispenses with B.W.'s argument that the circuit court did not properly exercise its discretion, "as the court clearly gave adequate consideration of and weight to each of the factors found in Wis. Stat. § 48.426(3)," so "[t]he Court's decision to terminate the rights of B.W. is well reasoned and its exercise of discretion is proper." Accordingly, the State asks that the court affirm the court of appeals' decision which affirmed the circuit court.

¶51 We conclude that B.W. has not made the prima facie showing required to withdraw his no contest plea. The circuit

31

court correctly informed B.W. of the statutory standard at disposition: the best interests of the child. Wis. Stat. § 48.426(2). We further conclude that the circuit court did not erroneously exercise its discretion when it considered D.D.'s testimony. In its decision to terminate B.W.'s parental rights, the circuit court appropriately weighed the required § 48.426(3) factors, including this testimony, and determined termination was in Bob's best interests.

A. Plea Withdrawal

¶52 "It has long been recognized that under the Due Process Clause, a defendant's . . . no contest plea must be knowingly, intelligently, and voluntarily entered." State v. Pegeese, 2019 WI 60, ¶21, 387 Wis. 2d 119, 928 N.W.2d 590 (citing State v. Bollig, 2000 WI 6, ¶15, 232 Wis. 2d 561, 605 N.W.2d 199 (citing another source)); Bangert, 131 Wis. 2d at 257; Wis. Stat. § 971.08. "Wisconsin imposes certain statutory and common law duties on circuit courts to ensure that a defendant's plea is given knowingly, intelligently, and voluntarily." Pegeese, 387 Wis. 2d 119, ¶21; see also State v. Taylor, 2013 WI 34, ¶30, 347 Wis. 2d 30, 829 N.W.2d 482 ("The duties established . . . in Bangert, and in subsequent cases are designed to ensure that a defendant's plea is knowing, intelligent, and voluntary."). "The circuit court must engage the parent in a colloquy to ensure that the plea is knowing, voluntary, and intelligent." Brown Cnty. Dep't Human Servs. v. Brenda B., 2011 WI 6, ¶35, 331 Wis. 2d 310, 795 N.W.2d 730.

32

"This colloquy is governed by the requirements of Wis. Stat. § 48.422(7) and notions of due process." Id., ¶35; (citing Steven H., 233 Wis. 2d 344, ¶¶25, 39.

¶53 Wisconsin Stat. § 48.422 outlines what a court must evaluate when conducting a plea colloquy in a TPR. Before the circuit court can "accept[] an admission of the alleged facts in the petition," it must:

> (a) Address the parties present and determine that the admission is made voluntarily with understanding of the nature of the acts alleged in the petition and the potential dispositions.
>
> (b) Establish whether any promises or threats were made to elicit an admission and alert all unrepresented parties to the possibility that a lawyer may discover defenses or mitigating circumstances which would not be apparent to them.
>
> (bm) Establish whether a proposed adoptive parent of the child has been identified . . .
>
> (br) Establish whether any person has coerced a birth parent or any alleged or presumed father of the child in violation of s. 48.63(3)(b)5. Upon a finding of coercion, the court shall dismiss the petition.
>
> (c) Make such inquiries as satisfactorily establish that there is a factual basis for the admission.

§ 48.422(7); see also Steven H., 233 Wis. 2d 344, ¶39; Therese S., 314 Wis. 2d 493, ¶5.

¶54 In Therese S., the court of appeals concluded:

> [I]n order for the court's explanation of potential dispositions to be meaningful to the parent, the parent must be informed of the statutory standard the court will apply at the second stage. That is, the court must inform the parent that "[t]he best interests of the child shall be the prevailing factor

33

considered by the court in determining the disposition. . . . ."

Therese S., 314 Wis. 2d 493, ¶16 (emphasis added).

¶55 The court is not required to "inform parents in detail of all potential outcomes" in order to ensure a plea is entered knowingly, intelligently, and voluntarily. Id., ¶17. The court of appeals agreed that requiring a circuit court to inform parents in detail of all potential outcomes would be "unduly burdensome." Id. But, "at the very least, a court must inform the parent" that "the best interests of the child shall be the prevailing factor considered by the court in determining the disposition." Id., ¶16; see also Brenda B., 331 Wis. 2d 310, ¶56.

¶56 "In addition, the person entering the no contest plea must have knowledge of the constitutional rights he or she is giving up by making the plea." Kenosha Cnty. Dep't Human Servs. v. Jodie W., 2006 WI 93, ¶25, 293 Wis. 2d 530, 716 N.W.2d 845. This comports with due process. As to due process, "whenever a parent wishes to plead no contest to grounds for involuntary termination, the parent must be provided with sufficient information to evaluate the stakes involved." Brenda B., 331 Wis. 2d 310, ¶41; see also Therese S., 314 Wis. 2d 493, ¶10. "The parent must be given sufficient information to understand the rights that could be lost if, during the second phase of the proceedings, the court decides to terminate parental rights." Brenda B., 331 Wis. 2d 310, ¶41.

34

¶57  "If the court fails to fulfill one of the duties mandated . . . under the <u>Bangert</u> line of cases (a '<u>Bangert</u> violation'), the defendant may move to withdraw his plea." <u>Taylor</u>, 347 Wis. 2d 30, ¶32 (citing <u>Bangert</u>, 131 Wis. 2d at 274).  A party filing a <u>Bangert</u> post-disposition motion for a TPR plea, "must make a prima facie showing that the circuit court violated its mandatory duties and must allege the parent did not know or understand the information that should have been provided at the hearing."  <u>Therese S.</u>, 314 Wis. 2d 493, ¶6.

¶58  As a result, B.W. must (1) "make a prima facie showing that the circuit court violated its mandatory duties," and (2) "allege [that B.W.] did not know or understand the information that should have been provided at the hearing."  <u>Therese S.</u>, 314 Wis. 2d 493, ¶6; <u>see also</u> <u>Brown</u>, 293 Wis. 2d 594, ¶39; <u>Steven H.</u>, 233 Wis. 2d 344, ¶42; <u>Bangert</u>, 131 Wis. 2d at 274.  "A [parent] attempting to make this prima facie showing must point to deficiencies in the plea hearing transcript; conclusory allegations are not sufficient."  <u>Taylor</u>, 347 Wis. 2d 30, ¶32 (citing <u>Cross</u>, 326 Wis. 2d 492, ¶19).  "[F]or a motion to be sufficient, it must allege "who, what, where, when, why, and how."  <u>State v. Sulla</u>, 2016 WI 46, ¶36, 369 Wis. 2d 225, 880 N.W.2d 659 (quoting <u>State v. Allen</u>, 2004 WI 106, ¶23, 274 Wis. 2d 568,  682  N.W.2d 433).   If  the  parent's  motion demonstrates a prima facie violation, "the court must hold a post-disposition evidentiary hearing at which the state is given an opportunity to show by clear and convincing evidence that the [parent's] plea was knowing, intelligent, and voluntary despite

35

the identified inadequacy of the plea colloquy." Brown, 293 Wis. 2d 594, ¶40 (citing Bangert, 131 Wis. 2d at 274).

¶59 Wisconsin Stat. § 48.426(2) mandates that, "The best interests of the child shall be the prevailing factor considered by the court in determining the disposition of all proceedings under this subchapter." Courts are required to use this standard at disposition when determining whether to terminate parental rights.

¶60 B.W.'s argument before us is that the plea colloquy was defective because the court erred when it explained that the "same trial rights" that applied at grounds would extend to disposition and the burden of proof at grounds was one of those rights. He says that he believed the State's clear and convincing burden of proof applicable at grounds, was such a "trial right" that would apply at disposition. B.W. argues that "the requirement that the State prove grounds by clear and convincing evidence is a trial right, even if the court did not specifically call it one," citing to Brenda B., 331 Wis. 2d 310, ¶43 ("It is important that the parent understand that by pleading no contest to a ground for termination, the parent is waiving the right to make the petitioner prove unfitness by clear and convincing evidence."). He avers this demonstrates a prima facie showing that his plea was not knowing, intelligent and voluntary so as to warrant an evidentiary hearing.

¶61 In order to analyze whether B.W. has made a prima facie showing, we turn to the language of the plea colloquy. See State v. Negrete, 2012 WI 92, ¶¶19-20, 343 Wis. 2d 1, 819

36

N.W.2d 749 (outlining the <u>Bangert</u> burden-shifting procedure for plea withdrawals "predicated on a defendant making 'a pointed showing' of an error in the plea colloquy by reference to the plea colloquy transcript") (quoting another source); <u>see also</u> <u>State v. A.G.</u>, 2023 WI 61, ¶41, 408 Wis. 2d 413, 992 N.W.2d 75 (Hagedorn, J., concurring) (citing <u>State v. Clark</u>, 2022 WI 21, ¶¶13–16, 401 Wis. 2d 344, 972 N.W.2d 533 ("[A] prima facie showing will generally focus on the plea colloquy itself to determine whether certain requirements were not followed.")). In so doing, we see that the record does not support B.W.'s arguments. Instead, the record demonstrates that the circuit court properly explained the procedure to B.W., first outlining the burden of proof applicable at the grounds phase:

> THE COURT: Now, you understand that nobody can force you to plead no contest to the grounds phase in this case, right?
>
> [B.W.] Yes, ma'am.
>
> THE COURT: You have an absolute [right] to a trial. It could be a jury trial which we have set next week, or it could be a trial just to the judge. Do you understand that?
>
> [B.W.] Yes, ma'am.
>
> . . .
>
> THE COURT: <u>But either way, it's the State's burden to prove by clear, convincing, and satisfactory evidence to a reasonable certainty that the grounds exist.</u> And the State would try to do that by calling witnesses to the stand. They would testify under oath. You would have a right to cross-examine them, and the right to introduce your own evidence. The right to use subpoenas to require witnesses to come to court and testify for you. Also the right to testify

37

yourself or remain silent knowing silence can be used against you.

Do you understand that by pleading no contest you're giving up all those trial rights to the first half of the case?

[B.W.]  Yes, ma'am.

(Emphasis added.)

¶62  In its plea colloquy, the circuit court said, "[I]t's the State's burden to prove by clear, convincing, and satisfactory evidence to a reasonable certainty that the grounds exist." The record reflects that the court was referring to the burden of proof at the grounds phase, not the dispositional phase. The court then clearly explained to B.W., three times, that the "best interests of the child" standard would apply at disposition.

¶63  Regarding disposition, unlike the grounds phase, no burden of proof was ever stated, but rather the statutory standard of "best interests of the child" was repeatedly spoken:

THE COURT:  Now, that does not mean you're giving up your trial rights to the second half of the case. And that's what we call disposition.  And at that hearing, the Court would have to decide if it's in the child's best interest to actually terminate your parental rights.  Does that make sense?

[B.W.]  Yes, ma'am.

THE COURT: And at all those same trial rights then you would have again in the second half, it's just a trial to the Judge in the second half.  Does that match your understanding?

[B.W.]  Yes.

¶64  The court further explained the process:

38

Now, assuming I accept your no contest plea as knowing, intelligent, and voluntary, I will then take some brief testimony to make sure there's a factual basis for it.  And then by statute I will be required to find you unfit as a parent as to [Bob].  Do you understand I'll have to make that finding?

[B.W.]  Yes.

THE COURT:  However, if I do not terminate your parental rights, if I do not find that to be in [Bob's] best interest, the termination of parental rights petition will be dismissed, and that unfitness finding will be reversed or vacated, okay?

[B.W.]  Yes, ma'am.

THE COURT:  Now, at that second half of the case, the disposition, I basically have two choices.  Either I find it's in [Bob's] best interest to terminate your parental rights, and I do so.  Or I do not find that, and I dismiss the TPR petition.  Does that make sense?

[B.W.]  Yes, ma'am.

¶65  A parent who pleads no contest to the grounds phase, still retains the right to contest termination at the separate and distinct disposition phase.  In contesting termination, B.W. does retain "rights."  A closer look at the record demonstrates that, while the court did explain that B.W. would have the "same rights" at the dispositional phase, the court never referred to the burden of proof at the grounds phase as a "right."  Instead, the court used the term "right(s)," precisely and specifically referring to B.W.'s procedural and constitutional rights:  the right to a trial (to a jury or a judge), the right to call and cross-examine witnesses, the right to subpoena witnesses, and the right to testify or to remain silent.  In short, the record reflects that the circuit court did not characterize the clear

39

and convincing burden of proof applicable at grounds, as a trial right that would be applicable at disposition. See A.G., 408 Wis. 2d 413, ¶38 (lead opinion) (circuit court characterized the clear and convincing burden of proof as a right, but our court nonetheless determined that the plea was knowing, free, and voluntary).

¶66 In short, B.W.'s arguments are unsupported by the record. The plea colloquy reflects that the court never used the term "burden of proof" when discussing the disposition phase. When discussing the standard the court would apply at disposition, the court repeatedly stated the statutory standard of "best interests of the child." Separately, the court properly used the term "right" when referring to certain specific rights, but it did not use that term when referring to the burden of proof applicable to the grounds phase.

¶67 B.W. fails to make a prima facie showing under Bangert that the circuit court's reference to "trial rights" meant that the clear, satisfactory, and convincing burden of proof applicable at the grounds phase, also applied at the disposition phase. Instead, the court repeatedly stated the correct standard at disposition——the best interests of the child. The circuit court's colloquy complied with the language of the statute. Wisconsin Stat. § 48.426(2) states, "The best interests of the child shall be the prevailing factor" at disposition. Therese S., 314 Wis. 2d 493, ¶16 ("Additionally, we conclude that in order for the court's explanation of potential dispositions to be meaningful to the parent, the

40

parent must be informed of the statutory standard the court will apply at the second stage. That is, the court must inform the parent that '[t]he best interests of the child shall be the prevailing factor considered by the court in determining the disposition. . . .'"). At the plea hearing, the court said that the standard at disposition would be the child's "best interest." Stating the statutory language, "best interests of the child," is sufficient. By the court stating the applicable statutory standard for disposition, "the best interests of the child," the court has properly advised the parent of "sufficient information to evaluate the stakes involved." Brenda B., 331 Wis. 2d 310, ¶41; see also Jodie W., 293 Wis. 2d 530, ¶25.

¶68 The plea colloquy is sufficient. B.W.'s motion to withdraw his no contest plea is not entitled to an evidentiary hearing.

### B.  Reliance on D.D.'s Testimony.

¶69 At disposition, the circuit court is required to consider the factors set forth in Wis. Stat. § 48.426(3). The record demonstrates that the circuit court properly complied with that statute and exercised its discretion in considering the statutory factors at disposition. In so doing, it referenced the potential future contact between Bob and B.W., given the fact that B.W. has another child with D.D., the proposed adoptive parent. B.W. may disagree with the circuit court's conclusions about termination, but that does not constitute reversible error.

41

¶70 A circuit court's decision to terminate parental rights is discretionary. Margaret H., 234 Wis. 2d 606, ¶27; Gerald O. v. Cindy R., 203 Wis. 2d 148, 152, 551 N.W.2d 855 (Ct. App. 1996). "A circuit court properly exercises its discretion when it examines the relevant facts, applies a proper standard of law, and using a demonstrated rational process reaches a conclusion that a reasonable judge could reach." Dane Cnty. Dep't of Human Servs. v. Mable K., 2013 WI 28, ¶39, 346 Wis. 2d 396, 828 N.W.2d 198. "When reviewing a trial court's exercise of discretion, we are permitted to search the record for reasons to sustain such a determination." Sulla, 369 Wis. 2d 225, ¶23. Finally, "this court will affirm a discretionary decision by a circuit court as long as the court did not erroneously exercise its discretion." Nat'l Auto Truckstops, Inc. v. DOT, 2003 WI 95, ¶12, 263 Wis. 2d 649, 665 N.W.2d 198. The record demonstrates that the court properly used its discretion and applied each of the statutory factors. See Wis. Stat. § 48.426(3); see also ¶36 n.11, supra.

¶71 The court found: (1) Bob was "likely to be adopted post-termination" by D.D., who was "licensed and committed" to adopting Bob, Wis. Stat. § 48.426(3)(a); (2) "[a]t the time of removal, [Bob] was not in good mental health, given the really difficult experiences that he had. Today he's still working through those experiences, but overall he is thriving, and that's an important thing that the Court doesn't want to disrupt," § 48.426(3)(b); (3) Bob "does have a substantial relationship with [B.W.]" but "I don't think he has a

42

substantial relationship with the mother or any extended family members."  While [t]here's always some harm in severing legal relationships, but I think that harm will be mitigated by the coparenting circumstances I've just described," § 48.426(3)(c); (4) "[Bob's] wishes are complex as can be understood, but he certainly is bonded with [D.D.], . . . is living with his half-sibling . . . thriving in that home, and he has recognized those benefits," § 48.426(3)(d); (5) Bob "has been separated from his parents since 2019, so a significant chunk of his young life," § 48.426(3)(e); and (6) "most fundamentally, it's the stability and permanency [for Bob] that the Court is seeking in making its decision today," § 48.426(3)(f).

¶72  B.W. nonetheless argues that State v. Margaret H., 234 Wis. 2d 606, supports his argument that the circuit court erroneously exercised its discretion when it "concluded that any harm to Bob caused by terminating his legal relationship with B.W. was mitigated because the court expected D.D. to continue to allow B.W. to visit with Bob."  B.W. argues that in relying on the adoptive parent's "promise," "the court failed to consider that D.D.'s assurance that she would allow for continued contact between B.W. and Bob was unenforceable." According to B.W., "the court hinged its entire consideration of factor three——whether it would be harmful to Bob to sever his relationship with B.W.——on D.D.'s unenforceable promise."  B.W. refers to D.D.'s testimony that post-termination, she "would still expect [B.W.] to be in full contact" with Bob and that "as

43

long as it's safe, [it's] fine" that the relationship between
B.W. and Bob continue.  But, what the circuit court stated is:

> [G]iven that you and [D.D.] have a child in common,
> you guys already co-parent, I'm trusting that you guys
> will continue to do so.  And as you continue with your
> stability and sobriety, the further you get into that
> the safer you'll be for overnight visits, for really
> meaningful co-parenting even if the legal relationship
> is severed, and I found [D.D.'s] testimony to be
> credible that she would do that.

¶73 The record does not support B.W.'s argument that
D.D.'s comments were a "promise."  In fact, in Margaret H., we
said that while a circuit court "may within its discretion
consider [an adoptive parent's] good faith promise" regarding
post-termination visitation arrangements, but a court should not
"hinge its determination on that legally unenforceable promise."
Margaret H., 234 Wis. 2d 606, ¶30.  D.D.'s comments that she
"would still expect [B.W.] to be in full contact" with Bob and
that "as long as it's safe, [it would be] fine" that the
relationship between B.W. and Bob continue, were referenced by
the court, but the record does not reflect that the court
considered this to be a promise, unenforceable or otherwise.

¶74 B.W.'s reliance on Margaret H. is misplaced.  In
Margaret H., the circuit court found rights to terminate the
birth mother's parental rights.  At disposition, the foster
mother "testified that she intended to foster the twins'
relationship with their birth family and that she envisioned
continued visitation even upon adoption."  Id., ¶9.  The circuit
court dismissed the termination petition referencing the

44

"evidence on both sides of the issue on whether or not the relationship is substantial" finding it "would be harmful to these boys to sever that relationship." Id., ¶10. The circuit court noted that Margaret H. "has never wavered in her desire or her love for her grandchildren" and "she has made every attempt to put herself in a position and at this time I just can't take that away from her." Id.

¶75 The court of appeals reversed and remanded. Our court affirmed and remanded "for a consideration of all the relevant factors" and application of the "best interests of the child" standard. Id., ¶¶31-35. We stated:

> In its discretion, the court may afford due weight to an adopted parent's stated intent to continue visitation with family members, although we cannot mandate the relative weight to be placed on this factor.
>
> In this case, the court may certainly choose to examine the probability that [the adoptive parent] will be faithful to her promise, at the same time bearing in mind that such promises are legally unenforceable once the termination and subsequent adoption are complete. The circuit court may within its discretion consider her good faith promise, but it should not be bound to hinge its determination on that legally unenforceable promise.

Id., ¶¶29-30 (citation omitted). We concluded that the circuit court "failed to consider all of the relevant statutory factors." Id., ¶31. The best interests of the child is the polestar of all determinations under ch. 48, the Children's Code [1997-98]." Id., ¶¶33, 36.

¶76 B.W. interprets Margaret H. as requiring a circuit court to consider that promises by an adoptive parent are

45

legally unenforceable, and presumably to do so on the record. Margaret H. requires that the court not "hinge" its decision on one factor but instead consider each statutory factor. While "[t]he circuit court may within its discretion consider her good faith promise" to allow contact and visitation with family, it should not "hinge its determination on that legally unenforceable promise." Margaret H., 234 Wis. 2d 606, ¶30 (emphasis added).

¶77 Unlike in Margaret H., the circuit court here considered each statutory factor in Wis. Stat. § 48.426(3) and did not "exclusively focus" on the harm of the legal severance of the relationship between B.W. and Bob or D.D.'s "unenforceable promise." The record "reflect[s] adequate consideration of and weight to each factor." Margaret H., 234 Wis. 2d 606, ¶35. The third statutory factor, harm of legal severance, was but one factor the circuit court considered. The court also considered and evaluated the other statutory factors. The court complied with its mandatory duty and afforded weight to each factor, utilizing the statutory standard of "best interests of the child."

¶78 The court's decision to "examine the probability" of D.D.'s "good faith promise" lies within its discretionary domain. Requiring circuit courts to say on the record such things as, "I know this promise is unenforceable, but," would be requiring circuit courts to use "magic words" to exercise discretion appropriately. "This court strongly disfavors magic words." A.G., 408 Wis. 2d 413, ¶29; see also Marathon Cnty. v.

D.K., 2020 WI 8, ¶66, 390 Wis. 2d 50, 937 N.W.2d 901 (Rebecca Grassl Bradley, J., concurring) ("We do not impose a 'magic words' requirement in the law and this court has repeatedly rejected them."); State v. Lepsch, 2017 WI 27, ¶36, 374 Wis. 2d 98, 892 N.W.2d 682 (rejecting in context of a circuit court inquiring about juror bias); State v. Wantland, 2014 WI 58, ¶33, 355 Wis. 2d 135, 848 N.W.2d 810 (rejecting in context of withdrawing consent under the Fourth Amendment); Elections Bd. v. Wisconsin Mfrs. & Commerce, 227 Wis. 2d 650, 654, 669-70, 597 N.W.2d 721 (1999) (rejecting in context of what is required to "express advocacy"); Patchak v. Zinke, 583 U.S. ___, 138 S. Ct. 897, 905 (2018) (noting that the United States Supreme Court refrains from reading statutes to "incant magic words" (quoted source omitted)).

¶79 B.W. identifies nothing in the record which would demonstrate that the circuit court believed this co-parenting relationship was enforceable. The court did not "order" any such future co-parenting. In fact, the words of the court were that it "trusted" that the co-parenting may continue: "I'm trusting that you guys will continue to do so." Using the word "trust" surely indicates that the court knew it could not demand they continue co-parenting as that would be unenforceable.

¶80 B.W. argues that "the circuit court's notion of a 'co-parenting' relationship of Bob between D.D. and B.W. improperly characterized what occurs following termination of parental rights, erroneously suggesting that a substantive ongoing parenting relationship between B.W. and Bob would occur." But

47

nothing precludes a circuit court from considering the facts of the case, which here reflect that B.W. and the proposed adoptive parent have another child in common, and D.D. would like to see contact continue with B.W. for that child and Bob.  The statute does not limit a circuit court from considering whether an adoptive parent might allow a continuing relationship with the child and the child's biological family.  In fact, the statute's language, "including but not limited to,"[14] recognizes that the court may consider matters apart from the factors specifically listed.  Wis. Stat. § 48.426(3).  The record reflects that the court considered the unique facts present.[15]  The proposed

---

[14] See Wis. Stat. § 48.426(3) ("In considering the best interests of the child under this section the court shall consider but not be limited to the following" list, including "likelihood of adoption," and "whether the child has substantial relationships with the parent or other family members, and whether it would be harmful to the child to sever those relationships" (emphasis added).); Margaret H., 234 Wis. 2d 606, ¶29 ("[W]e note that Wis. Stat. § 48.426(3)(a) requires only that the circuit court examine the impact of a legal severance on the broader relationships existing between a child and his or her family. In its discretion, the court may afford due weight to an adoptive parent's stated intent to continue visitation with family members, although we cannot mandate the relative weight to be placed on this factor.").

[15] Wisconsin Stat. § 48.426(3)(c) states that the court shall consider "[w]hether the child has substantial relationships with the parent or other family members, and whether it would be harmful to the child to sever those relationships," but the court is not limited to following only the statutory factors:

> To the extent that the court of appeals' statement may be interpreted as insisting that the circuit court at least consider [the adoptive parent's] promise to continue contact between the twins and their birth family, we note that Wis. Stat. 48.426(3)(c) requires

adoptive parent and B.W. were co-parenting another child they had in common. The court, much like at the grounds phase, was encouraging to B.W.[16] But encouraging words should not be mistaken for an erroneous exercise of discretion. The court's conclusion to terminate B.W.'s parental rights to Bob was based on a consideration of each statutory factor. The court considered the best interests of Bob as paramount and although a "close call" and "difficult decision," the court ultimately concluded that B.W.'s parental rights to Bob must be terminated.

¶81 The circuit court did not "improperly rely" on D.D.'s "promise," as B.W. argues. Here, the circuit court may have referenced the facts from testimony in the hope that there could be some continued connection between B.W. and Bob, and that recognition is not prohibited. The record reflects that the

> only that the circuit court examine the impact of a legal severance on the broader relationships existing between a child and his or her family. In its discretion, the court may afford due weight to an adoptive parent's stated intent to continue visitation with family members, although we cannot mandate the relative weight to be placed on this factor.
>
> In this case, the court may certainly choose to examine the probability that [the adoptive parent] will be faithful to her promise, at the same time bearing in mind that such promises are legally unenforceable once the termination and subsequent adoption are complete. The circuit court may within its discretion consider her good faith promise, but it should not be bound to hinge its determination on that legally unenforceable promise.

Margaret H., 234 Wis. 2d 606, ¶¶29-30.

[16] See ¶14, supra.

court reviewed the facts specific to this case, applied the statutory factors, and tried to encourage B.W. to continue with positive steps, even though it was in Bob's best interests to terminate B.W.'s parental rights. As the court noted, while "[t]here's always some harm in severing legal relationships . . . that harm will be mitigated by the coparenting circumstances." D.D. and B.W. co-parent one child, and unlike most TPR cases, these unique circumstances present the opportunity for B.W. to see Bob in the future. B.W.'s argument that the circuit court "did not consider that D.D.'s testimony that she would allow B.W. to continue to have contact with Bob was an unenforceable promise," thus fails.

¶82 In short, the circuit court properly exercised its discretion at the dispositional hearing. The circuit court "examine[d] the relevant facts" of this case, "applie[d] a proper standard of law," and "using a demonstrated rational process" of applying the statutory factors, "reach[ed] a conclusion that a reasonable judge could reach." Mable K., 346 Wis. 2d 396, ¶39. The record does not support B.W.'s assertion that the circuit court believed D.D.'s promise was enforceable. Id. "The ultimate determination of whether to terminate parental rights is discretionary with the circuit court." Margaret H., 234 Wis. 2d 606, ¶27. We affirm the circuit court's discretionary decision to terminate B.W.'s parental rights, as the circuit court properly exercised its discretion.

¶83 The "polestar" determination for the circuit court at disposition, as was explained in the plea colloquy, was the best

50

interests of the child. Repeatedly throughout its colloquy with B.W., the circuit court informed B.W. that at disposition "the court would have to decide whether [termination was] actually in [Bob's] best interest." The circuit court acknowledged that the best interests of Bob were paramount, reminding B.W. at disposition that while B.W.'s progress was commendable, the court's "focus today has to be on what is in [Bob's] best interest as opposed to [B.W.'s] best interest." The court did not erroneously consider D.D.'s testimony.

## IV. CONCLUSION

¶84 B.W. argues that the plea colloquy is defective because the circuit court miscommunicated that a clear, satisfactory, and convincing burden of proof applied at disposition. He argues that the burden of proof is a trial right and when the court incorrectly advised B.W. that he would have "all those same trial rights" at disposition, the court misinformed him that this burden of proof, rather than the "best interests of the child" standard, would apply at disposition. B.W. also argues that at disposition, the circuit court improperly relied on the proposed adoptive parent's assurance that she would allow B.W. to continue to visit and "co-parent" Bob.

¶85 We conclude that B.W. failed to make a prima facie showing that the plea colloquy was defective. At the plea hearing, the circuit court properly informed B.W. that the prevailing factor at disposition is the statutory

51

standard: "The best interests of the child."  Wis. Stat. § 48.426(2).

¶86 We also conclude that at disposition, the circuit court did not erroneously exercise its discretion by relying on the proposed adoptive parent's testimony that post-termination, she would allow B.W. to continue to visit with Bob and that they would "co-parent."  The court did not fail to consider that this testimony was an "unenforceable promise," nor did the court "hinge" termination on this testimony.  The circuit court properly exercised its discretion, considering the testimony and weighing the statutory dispositional factors of Wis. Stat. § 48.426(3).

*By the Court.*—The decision of the court of appeals is affirmed.

¶87 ANNETTE KINGSLAND ZIEGLER, C.J. *(concurring).* B.W. agrees and acknowledges "the statutory standard required in Wis. Stat. § 48.426(2) does not set a burden of proof level" and "[t]here is no burden of proof placed on the State at disposition." The State agrees with B.W. that "'the polestar at a dispositional hearing is simply the best interests of the child' and no burden of proof exists." The court of appeals' decision from which B.W. appeals, determined the same: "[t]he plain language of [§ 48.426(2)] does not set a burden of proof."[1]

¶88 There is no burden of proof under Wis. Stat. § 48.426(2) at disposition because the statute does not provide for one. And, considerations of procedural due process do not require one. The legislature has demonstrated that it is quite capable of stating a particular burden of proof, when one is applicable. At disposition, the statute mandates the circuit court to weigh the statutory factors[2] and use its discretion to

---

[1] As noted in the majority, this case comes to us on appeal from a decision by the court of appeals, <u>State v. B.W.</u>, No. 2022AP1329, unpublished slip op., ¶15 (Wis. Ct. App. Sept. 12, 2023).

[2] The statutory factors are:

   (a) The likelihood of the child's adoption after termination.

   (b) The age and health of the child, both at the time of the disposition and, if applicable, at the time the child was removed from the home.

   (c) Whether the child has substantial relationships with the parent or other family members, and whether it would be harmful to the child to sever these relationships.

determine what disposition is in the child's best interests, but makes no mention of a burden of proof requirement. A parent's procedural due process concerns are also lessened at this stage of the proceedings, because the court has already decided that the grounds exist to find the parent unfit.

¶89 We too should definitively conclude that there is no burden of proof, under Wis. Stat. § 48.426(2), at disposition. I join the majority opinion, but concur and write separately to provide clarity to our circuit courts that there is no burden of proof required at disposition in termination of parental rights proceedings under § 48.426(2). Rather, the court's decision at the disposition phase is one within the sound and sole discretion of the court: what is in the child's best interests.

I

¶90 Termination of parental rights ("TPR") cases are governed by the Wisconsin Children's Code, Wis. Stat. ch. 48. TPR cases follow a bifurcated procedure——grounds and disposition. In recognition of the "profound consequences of

---

(d) The wishes of the child.

(e) The duration of the separation of the parent from the child.

(f) Whether the child will be able to enter into a more stable and permanent family relationship as a result of the termination, taking into account the conditions of the child's current placement, the likelihood of future placements and the results of prior placements.

Wis. Stat. § 48.426(3).

2

termination,"[3] Wisconsin implemented a robust statutory scheme. This statutory scheme protects familial interests through both stages of a TPR proceeding. At grounds, where "the parent's rights are paramount," the parent is afforded the "full complement of procedural rights" because the burden of proof is on the State to prove, by clear and convincing evidence, the statutory grounds for termination exist. Sheboygan Cnty. Dep't of Health & Human Servs. v. Julie A.B., 2002 WI 95, ¶24, 255 Wis. 2d 170, 648 N.W.2d 402; see also Evelyn C.R. v. Tykila S., 2001 WI 110, ¶22, 246 Wis. 2d 1, 629 N.W.2d 768. Procedural due process considerations also require this heightened burden of proof during the grounds phase. Steven V. v. Kelley H., 2004 WI 47, ¶23, 271 Wis. 2d 1, 678 N.W.2d 856 (citing Santosky v. Kramer, 455 U.S. 745, 747-48 (1982)).

¶91 At the grounds phase, the court conducts a fact-finding hearing to determine whether grounds exist to terminate parental rights. Wis. Stat. § 48.31(1). For grounds, the legislature set forth a statutory burden of proof: The State must prove by clear and convincing evidence that at least one of the statutory grounds for termination of parental rights exists. Id.; see also Evelyn C.R., 246 Wis. 2d 1, ¶¶21-22; Waukesha Cnty. Dep't Soc. Servs. v. C.E.W., 124 Wis. 2d 47, 60, 368 N.W.2d 47 (1985). If the court "determines that the facts alleged in the petition have not been proven, the court dismisses the petition." Julie A.B., 255 Wis. 2d 170, ¶26; Wis.

---

[3] Sheboygan Cnty. Dep't of Health & Human Servs. v. Julie A.B., 2002 WI 95, ¶23, 255 Wis. 2d 170, 648 N.W.2d 402.

Stat. § 48.424(3). If instead a parent decides to not contest the grounds phase of the TPR proceeding, the circuit court is required to undergo a colloquy with the parent to ensure that the parent understands the procedural rights that are being given up. Wis. Stat. § 48.422(7). As part of that plea colloquy, the court must explain and inform the parent not only of the rights being given up, but also needs to describe the potential dispositions that the court can consider in the second phase of the hearing. § 48.422(7)(a).

¶92 If "grounds" are proven or pled, the court proceeds to the second stage, the disposition phase under Wis. Stat. § 48.426(2). Just because the court accepts a no-contest plea to the grounds phase of a termination of parental rights hearing does not mean that the parent's rights are terminated. Instead, the court proceeds to the second phase which allows for any party to present evidence, including through testimony, to the circuit court as to what disposition is in the best interest of the child. Unlike the burden of proof required in the statute for the grounds phase, the legislature has not provided such language in § 48.426(2), which governs the procedures for the disposition phase. Instead, it is within the court's discretion to determine, considering the statutory factors and the evidence presented, whether termination is in "[t]he best interests of the child." § 48.426(2); Evelyn C.R., 246 Wis. 2d 1, ¶23; State v. Margaret H., 2000 WI 42, ¶¶33-34, 234 Wis. 2d 606, 610 N.W.2d 475.

II

4

¶93 Answering the question whether there is a burden of proof at disposition requires us to analyze statutes. In conducting our statutory interpretation analysis, we begin with the language of the statute. State ex rel. Kalal v. Cir. Ct. for Dane Cnty., 2004 WI 58, ¶44, 271 Wis. 2d 633, 681 N.W.2d 110; Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 56-58 (2012) (Supremacy-of-Text Principle).[4] In doing so, we are not "at liberty to disregard the plain, clear words of the statute." Kalal, 271 Wis. 2d 633, ¶46 (quoting State v. Pratt, 36 Wis. 2d 312, 317, 153 N.W.2d 18 (1967)). "We assume that the legislature's intent is expressed in the statutory language," as "[i]t is the enacted law, not the unenacted intent, that is binding on the public." Id.; see also Antonin Scalia, A Matter of Interpretation 17 (1997) ("It is the law that governs, not the intent of the lawgiver . . . . Men may intend what they will, but it is only the laws that they enact which bind us."). "If this process of analysis yields a plain, clear statutory meaning, then there is no ambiguity, and the statute is applied according to the ascertainment of its meaning." Bruno v. Milwaukee Cnty., 2003 WI 28, ¶20, 260 Wis. 2d 633, 660 N.W.2d 656.

¶94 Wisconsin Stat. § 48.31(1) imposes a "clear and convincing" burden of proof at grounds stating, "In this

---

[4] When interpreting a statute, the Supremacy-of-Text Principle states that "[t]he words of a governing text are of paramount concern, and what they convey, in their context, is what the term means." Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 56 (2012).

5

section, 'fact-finding hearing' means a hearing to determine if the allegations in a petition under s. 48.13 or 48.133 or a petition to terminate parental rights <u>are proved by clear and convincing evidence</u>" (emphasis added). Comparatively, Wis. Stat. § 48.426(2) governs disposition and states, "The best interests of the child shall be the prevailing factor considered by the court in determining the disposition of all proceedings under this subchapter."

¶95 Unlike Wis. Stat. § 48.31(1), Wis. Stat. § 48.426(2) contains no burden of proof. The language of § 48.426(2) is plain and its interpretation straightforward. Simply, there is no stated burden of proof at disposition of a TPR proceeding because the plain text of the statute does not provide for one. "[W]e ordinarily resist reading words or elements into a statute that do not appear on its face." <u>Bates v. United States</u>, 522 U.S. 23, 29 (1997).

¶96 The legislature has aptly demonstrated its ability to communicate when a burden of proof applies, as it did so for the grounds phase.[5] In conducting a "text-based, plain-meaning approach to statutory interpretation," the court must "guard against" substituting the judiciary's subjective policy choices for those of the legislature. <u>State v. Hayes</u>, 2004 WI 80, ¶112, 272 Wis. 2d 1, 681 N.W.2d 203 (Sykes, J., concurring). "It is not up to the courts to rewrite the plain words of statutes." <u>State v. Wiedmeyer</u>, 2016 WI App 46, ¶13, 370 Wis. 2d 187, 881 N.W.2d 805. Nor can courts "add words to a statute to give it a

---

[5] <u>See</u> ¶91, <u>supra</u>.

6

certain meaning." State v. Neill, 2020 WI 15, ¶23, 390 Wis. 2d 248, 938 N.W.2d 521. There is no burden of proof at disposition in the statute because we "interpret the words the legislature actually enacted into law[.]" State v. Fitzgerald, 2019 WI 69, ¶30, 387 Wis. 2d 384, 929 N.W.2d 165. Instead, "[t]he polestar at a dispositional hearing is simply the best interests of the child." State v. A.G., 2023 WI 61, ¶33, 408 Wis. 2d 413, 992 N.W.2d 75 (citing Brown Cnty. v. Brenda B., 2011 WI 6, ¶33, 331 Wis. 2d 310, 795 N.W.2d 730 (quoting Julie A.B., 255 Wis. 2d 170, ¶30)).

¶97 Not imposing a burden of proof for the judge determining disposition is consistent with the stated purpose of Chapter 48. At the beginning of Chapter 48, the legislature explained the judge's role: "In construing this chapter, the best interests of the child . . . shall always be of paramount consideration." Wis. Stat § 48.01(1). Section 48.01(1)(ag) states that "the court may determine that it is in the best interests of the child for the child to be removed from his or her parents, consistent with any applicable law relating to the rights of parents."

¶98 The text of various statutes reveals that the legislature does not always impose a burden of proof in the "best interests of the child" standard. Sometimes, however, the legislature does set forth a burden of proof.

¶99 For example, Wis. Stat. § 48.437 addresses certain changes in a child's placement. Under § 48.437(3), a court is prohibited from changing placement in the home of a person who

7

has been convicted of a homicide of a parent unless the court determines by "clear and convincing evidence" that placement is in the child's best interests. That statute states:

> Except as provided in this subsection, the court may not change a child's placement to a placement in the home of a person who has been convicted of the homicide of a parent of the child under s. 940.01 or 940.05, if the conviction has not been reversed, set aside, or vacated. <u>This subsection does not apply if the court determines by clear and convincing evidence that the placement would be in the best interests of the child. The court shall consider the wishes of the child in making that determination.</u>

§ 48.437(3) (emphasis added).

¶100 Similarly, under Wis. Stat. § 48.357(4d) (and its companion, Wis. Stat. § 938.357(4d)), the court may not change placement to the home of a person who has been convicted of homicide of a parent of a child or juvenile unless that conviction has been reversed, set aside, or vacated. Section § 48.357(4d) states:

> 48.357(4d) PROHIBITED PLACEMENTS BASED ON HOMICIDE IF PARENT. (a) Prohibition. Except as provided in par. (b), the court may not change a child's placement to a placement in the home of a person who has been convicted of the homicide of a parent of the child under s. 940.01 or 940.05, if the conviction has not been reversed, set aside, or vacated.
>
> (am) Change in placement required. Except as provided in par. (b), if a parent in whose home a child is placed is convicted of the homicide of the child's other parent under s. 940.01 or 940.05, and the conviction has not been reversed, set aside, or vacated, the court shall change the child's placement to a placement outside the home of the parent on petition of the child, the child's counsel or guardian ad litem, the guardian or legal custodian of the child, the person or agency primarily responsible for implementing the dispositional order, or the district

8

attorney or corporation counsel of the county in which the dispositional order was entered, or on the court's own motion with notice to the parent.

> (b) Exception. <u>Paragraphs (a) and (am) do not apply if the court determines by clear and convincing evidence that the placement would be in the best interests of the child.</u> The court shall consider the wishes of the child in making that determination.

(Emphasis added.) This statute sets forth the burden of proof of clear and convincing evidence that is required for the court to determine that the placement is in the child's best interest.

¶101 Under Wis. Stat. § 48.355(3) (and its companion, Wis. Stat. § 938.355(3)), the court may set rules of visitation for a parent, but the court must find that visitation is in the child's best interests. Section 48.355(3) states:

> (3) PARENTAL VISITATION. (a) Except as provided in par. (b), if, after a hearing on the issue with due notice to the parent or guardian, <u>the court finds that it would be in the best interest of the child, the court may set reasonable rules of parental visitation</u>.

> (b) 1. Except as provided in subd. 2., the court may not grant visitation under par. (a) to a parent of a child if the parent has been convicted under s. 940.01 of the first-degree intentional homicide, or under s. 940.05 of the 2nd-degree intentional homicide, of the child's other parent, and the conviction has not been reversed, set aside or vacated.

> 1m. Except as provided in subd. 2., if a parent who is granted visitation rights with a child under par. (a) is convicted under s. 940.01 of the first-degree intentional homicide, or under s. 940.05 of the 2nd-degree intentional homicide, of the child's other parent, and the conviction has not been reversed, set aside or vacated, the court shall issue an order prohibiting the parent from having visitation with the child on petition of the child, the guardian or legal custodian of the child, a person or agency bound by the dispositional order or the district attorney or corporation counsel of the county in which

9

the dispositional order was entered, or on the court's own motion, and on notice to the parent.

2. <u>Subdivisions 1. and 1m. do not apply if the court determines by clear and convincing evidence that the visitation would be in the best interests of the child. The court shall consider the wishes of the child in making that determination.</u>

(Emphases added.)

¶102 Wisconsin Stat § 48.217(3)(c) (and accompanying Wis. Stat. § 938.217(3)(c)), relates to change in placement based on homicide of a parent. Section 48.217(3)(c) notes that if the court finds by "clear and convincing evidence" that the placement is in the "best interest of the child," the court need not apply subs. (3)(a) or (3)(b).[6]

¶103 In the criminal statutory context, criminal courts have jurisdiction over a juvenile alleged to have committed certain crimes. But these statutes impose a burden of proof on the juvenile to prove by "clear and convincing evidence" that it would be in the best interests of the juvenile and the public to not waive the juvenile into adult court.[7] Wisconsin Stat. § 938.183(1m)(c)3. states:

---

[6] <u>See</u> Wis. Stat. § 48.217(3)(c): "Paragraphs (a) and (b) do not apply if the court determines by clear and convincing evidence that the placement would be in the best interests of the child. The court shall consider the wishes of the child in making that determination."

[7] <u>See</u> Wis. Stat. § 938.18(6) ("Decision on Waiver"):

After considering the criteria under sub. (5), the court shall state its finding with respect to the criteria on the record, and, <u>if the court determines on the record that there is clear and convincing evidence that is contrary to the best interests of the juvenile or of the public to hear the case, the court shall enter an order waiving jurisdiction and</u>

10

For a juvenile who is alleged to have attempted or committed a violation of s. 940.01 or to have committed a violation of s. 940.02 or 940.05 on or after the juvenile's 15th birthday, the court of criminal jurisdiction finds that the juvenile has not attempted to commit a violation of s. 940.01 or committed a violation of s. 940.01, 940.02, or 940.05, and the court of criminal jurisdiction, after considering the criteria under s. 938.18(5), determines that the juvenile has proved by clear and convincing evidence that it would be in the best interests of the juvenile and of the public to adjudge the juvenile to be delinquent and impose a disposition under s. 938.34.

(Emphasis added.)

¶104 In Wis. Stat. § 48.977(6), which deals with revisions of guardianship orders, the legislature chose yet again to require both a "clear and convincing burden" of proof and the "best interests of the child," even within the same subsection:

(6) REVISION OF GUARDIANSHIP ORDER. (a) Any person authorized to file a petition under sub. (4)(a) may request a revision in a guardianship order entered under this subsection or sub. (4)(h)2., or the court may, on its own motion, propose such a revision. The request or court proposal shall set forth in detail the nature of the proposed revision, shall allege facts sufficient to show that there has been a substantial change in circumstances since the last order affecting the guardianship was entered and that the proposed revision would be in the best interests of the child and shall allege any other information that affects the advisability of the court's disposition.

(b) The court shall hold a hearing on the matter prior to any revision of the guardianship order if the

referring the matter to the district attorney for appropriate proceedings in the court of criminal jurisdiction. After the order, the court of criminal jurisdiction has exclusive jurisdiction.

(Emphasis added.)

11

request or court proposal indicates that new information is available which affects the advisability of the court's guardianship order, unless written waivers of objections to the revision are signed by all parties entitled to receive notice under sub. (4)(c) and the court approves the waivers.

    (c) If a hearing is to be held, the court shall notify the persons entitled to receive notice under sub. (4)(c) at least 7 days prior to the hearing of the date, place and purpose of the hearing. A copy of the request or proposal shall be attached to the notice. <u>The court may order a revision if, at the hearing, the court finds that it has been proved by clear and convincing evidence that there has been a substantial change in circumstances and if the court determines that a revision would be in the best interests of the child.</u>

(Emphases added.)

¶105 As evidenced, the legislature has chosen to implement a burden of proof in conjunction with the "best interests of the child" considerations in other statutory sections inside Chapter 48. However, numerous places in Chapter 48 reference the "best interests of the child" standard, but do not require more than an accompanying discretionary determination.

¶106 For example, Wis. Stat. § 48.299 (and its companion, Wis. Stat. § 938.299) addresses procedures at hearings. Section 48.299(1)(ag) references who may be present at a custody hearing and provides that certain individuals may be excluded from a hearing which deals with sensitive personal information if it is in the child's best interest:

    In a proceeding other than a proceeding under s. 48.375(7), if a public hearing is not held, only the parties and their counsel or guardian ad litem, the court-appointed special advocate for the child, the child's foster parent or other physical custodian described in s. 48.62(2), witnesses, and other persons requested by a party and approved by the court may be

present, except that the court may exclude a foster parent or other physical custodian described in s. 48.62(2) from any portion of the hearing if that portion of the hearing deals with sensitive personal information of the child or the child's family or if the court determines that excluding the foster parent or other physical custodian would be in the best interests of the child. Except in a proceeding under s. 48.375(7), any other person the court finds to have a proper interest in the case or in the work of the court, including a member of the bar or a person engaged in the bona fide research, monitoring, or evaluation of activities conducted under [42 U.S.C. § 629h], as determined by the director of state courts, may be admitted by the court.

§ 48.299(1)(ag) (emphasis added). Additionally, Wis. Stat. § 48.299(3) states that a child must be present for hearings under Chapter 48 unless the court finds it is in the best interests of the child not to be present but does not provide a burden of proof for the court to make this decision.[8]

¶107 Wisconsin Stat. § 48.358(2) provides for a trial reunification, but the agency responsible for implementing the dispositional order must provide a statement as to why trial reunification is in the "best interests" of the child. See § 48.358(2)(a) ("The request shall contain . . . a statement describing why the trial reunification is in the best interests

---

[8] According to Wis. Stat. § 48.299(3):

    If the court finds that it is in the best interest of the child, and if the child's counsel or guardian ad litem consents, the child may be temporarily excluded by the court from a hearing on a petition alleging that the child is in need of protection or services. If the court finds that a child under 7 years of age is too young to comprehend the hearing, and that it is in the best interest of the child, the child may be excluded from the entire hearing.

13

of the child . . . ."); see also § 48.358(2)(d) ("If the court finds that the trial reunification is in the best interests of the child and that the trial reunification satisfies the objectives of the child's permanency plan, the court shall order the trial reunification."). Again, the statutes do not identify a burden of proof that the court must apply in making this decision.

¶108 Under Wis. Stat. § 48.365(2g)(b)3. and its companion, Wis. Stat. § 938.365(2g)(b)3., when a child is placed outside of the home for 15 of the most recent 22 months, a report must be submitted with a recommendation which must include why adoption is in the "best interests" of the child or juvenile. And, in Wis. Stat. § 48.988(6), a juvenile delinquent may be placed in another state's institution, but the court must find that it is in the "best interest of the child":

> A child adjudicated delinquent may be placed in an institution in another party jurisdiction pursuant to this compact but no such placement shall be made unless the child is given a court hearing on notice to the parent or guardian with opportunity to be heard, prior to being sent to such other party jurisdiction for institutional care and the court finds that:
>
>     (a) Equivalent facilities for the child are not available in the sending agency's jurisdiction; and
>
>     (b) Institutional care in the other jurisdiction is in the best interest of the child and will not produce undue hardship.

(Emphases added.) The differences in the statutes identifying a burden of proof imposed on the court versus statutes which omit a burden of proof in the Children's Code show that the legislature deliberately chose to omit or include a burden of

14

proof. "Under the omitted-case canon of statutory interpretation, '[n]othing is to be added to what the text states or reasonably implies (casus omissus pro omisso habendus est). That is, a matter not covered is to be treated as not covered.'" State v. Schultz, 2020 WI 24, ¶52, 390 Wis. 2d 570, 939 N.W.2d 519 (quoting Scalia & Garner, supra ¶93, at 93).

¶109 Even looking beyond Chapter 48,[9] we see that the "best interests of the child" is a standard that the legislature imposes in, for example, family law. In initial determinations of legal custody and periods of physical placement between parents, the best interests of the child controls. See, e.g., Wis. Stat. § 767.41(2)(a) ("Subject to pars. (am) to (e), based on the best interest of the child . . . the court may give joint legal custody or sole legal custody of a minor child."); § 767.41(2)(am) ("Except as provided in par. (d), the court shall presume that joint legal custody is in the best interest of the child."); § 767.41(2)(b) ("Except as provided in par. (d) and subject to par. (e), the court may give sole legal custody only if it finds that doing so is in the child's best interest . . . ."). Farther in the same section, § 767.41(2)(d), is an example of the legislature imposing a

---

[9] See, e.g., Chapter 46 ("Social Services"); Chapter 49 ("Public Assistance and Children and Family Services"); Chapter 301 ("Corrections"); Chapter 324 ("Deployed Parents Custody and Visitation"); Chapter 51 ("State Alcohol, Drug Abuse, Developmental Disabilities and Mental Health"); Chapter 54 ("Guardianships and Conservatorships"); Chapter 118 ("General School Operations"); Chapter 813 ("Injunctions, Ne Exeat and Receivers"); and Chapter 938 ("Juvenile Justice Code").

burden of proof and a rebuttable presumption, yet still requiring consideration of the best interests of the child:

> 1. Except as provided in subd. 4., if the court finds by a preponderance of the evidence that a party has engaged in a pattern or serious incident of interspousal battery, as described under s. 940.19 or 940.20(1m), or domestic abuse, as defined in s. 813.12(1)(am), pars. (am), (b), and (c) do not apply and there is a rebuttable presumption that it is detrimental to the child and contrary to the best interest of the child to award joint or sole legal custody to that party. The presumption under this subdivision may be rebutted only by a preponderance of evidence of all of the following: . . .
>
> b. It is in the best interest of the child for the party who committed the battery or abuse to be awarded joint or sole legal custody based on a consideration of the factors under sub. (5)(am).

§ 767.41(2)(d)1.b. (emphases added).

¶110 Much like the provisions in Chapter 48, Wis. Stat. § 767.44(2) similarly states that the court would need to determine by "clear and convincing evidence" that visitation or periods of physical placement would be in the "best interest of the child" when determining whether physical visitation or physical placement should be with a parent who kills another parent. In other words, the legislature seems to use the "best interests" language and the corresponding burden of proof in this unseemly scenario, consistently from chapter to chapter.

¶111 Wisconsin Stat. § 767.451(1) addresses when and how custody or physical placement may be modified. Under § 767.451(1)(b)1.a., the court "may modify an order of legal custody or an order of physical placement" if the court finds, among other things, "[t]he modification is in the best interest

16

of the child." This statute sets forth a rebuttable presumption that continuing the current allocation of decision making under a legal custody order is in the best interest of the child and that continuing the child's physical placement with the parent with whom the child resides for the greater period of time is in the best interests of the child, and if the parents have equal periods of placement the rebuttable presumption is that remains.

¶112 Wisconsin Stat. § 767.451(3) considers when modification will not substantially alter the amount of time a parent spends with a child: The court may modify the order "if the court finds that the modification is in the best interest of the child." If a parent relocates, then the court considers whether a proposed relocation plan is in the child's best interests. See Wis. Stat. § 767.481(2)(b) ("If the court finds at the initial hearing that the parent not filing the motion was properly served . . . the court shall approve the proposed relocation plan . . . unless the court finds that the proposed relocation plan is not in the best interest of the child."); Wis. Stat. § 767.481(3) ("[T]he court may issue a temporary order . . . to allow the parent proposing the relocation to relocate with the child if the court finds that the relocation is in the child's immediate best interest."); Wis. Stat. § 767.225(1)(am) ("If the court grants physical placement to one parent for less than 25 percent of the time, . . . the court shall enter specific findings of fact as to the reasons that a greater allocation of physical placement with that parent is not in the best interests of the child.").

17

¶113 Regarding a modification of judgment under Wis. Stat. § 767.461, parties may stipulate to a modification of an order of physical placement or legal custody "unless the court finds that the modification is not in the best interest of the child." Similarly, under Wis. Stat. § 767.451(2), the court may modify equal physical placement if it is in the "best interests of the child" and the rebuttable presumption that "having substantially equal periods of physical placement is in the best interests of the child."[10]

¶114 In another example, under Wis. Stat. § 767.511(1m), the court may deviate from child support standard shirking but must consider the "best interests of the child." It states both

---

[10] The statute, entitled "Modification of substantially equal physical placement orders," states as follows:

Notwithstanding sub. (1):

(a) If the parties have substantially equal periods of physical placement pursuant to a court order and circumstances make it impractical for the parties to continue to have substantially equal physical placement, a court, upon petition, motion, or order to show cause by a party, may modify the order if it is in the best interest of the child.

(b) In any case in which par. (a) does not apply and in which the parties have substantially equal periods of physical placement pursuant to a court order, a court, upon petition, motion, or order to show cause of a party, may modify the order based on the appropriate standard under sub. (1). However, under sub. (1)(b)2., there is a rebuttable presumption that having substantially equal periods of physical placement is in the best interest of the child.

Wis. Stat. § 767.451(2) (emphases added).

a burden of proof and consideration of the best interests of the child:

> Upon request by a party, <u>the court may modify the amount of child support payments</u> determined under sub. (1j) <u>if, after considering the following factors, the court finds by the greater weight of the credible evidence that use of the percentage standard is unfair</u> to the child or to any of the parties: . . .
>
> (hm)   <u>The best interests of the child.</u>

§ 767.511(1m)(hm) (emphases added).

¶115 Under Wis. Stat. § 767.34, parties may stipulate regarding child support, but the best interests of the child are paramount.  See also Wis. Stat. § 767.333(2)(a) ("If the judge approves the stipulation, the judge shall incorporate and enter the terms of a stipulation . . . as an initial order of physical placement or legal custody unless the judge finds that the terms are not in the best interest of the child."); see also <u>Frisch v. Henrichs</u>, 2007 WI 102, ¶75, 304 Wis. 2d 1, 736 N.W.2d 85; <u>May v. May</u>, 2012 WI 35, ¶¶18-19, 339 Wis. 2d 626, 813 N.W.2d 179.  The court retains equitable power to consider circumstances unforeseen by the parties when they enter into a stipulation that adversely affects the best interests of the child.

¶116 Under Wis. Stat. § 767.511(2), court may establish a separate fund or trust if it promotes the best interests of the child:  "The court may protect and promote the best interests of the minor children by setting aside a portion of the child support which either party is ordered to pay in a separate fund or trust for the support, education and welfare of such children."

19

¶117 Under Wis. Stat. § 767.401(1)(a), a court may order parties to attend programming concerning divorce if "the court determines that it is appropriate and in the best interest of the child . . . ." Pursuant to § 767.407(1)(e), a court may make a temporary order before a GAL recommendation but the court must "determine[] that the temporary order is in the best interest of the child."

¶118 Wisconsin Stat. § 767.405 addresses family court services, including court-appointed mediation. Under Wis. Stat. § 767.405(10), the mediator's powers and duties "shall be guided by the best interest of the child." Under Wis. Stat. § 767.405(12)(a), the GAL must comment on an agreement as a result of mediation being in the best interests of the child. The court may approve or reject the agreement based on the best interest of the child.

¶119 As we can see by the text of these statutes, the legislature is well versed at stating a burden of proof when and where it deems one to be applicable. We should not presume then that the legislature has imposed a burden of proof where it has

20

not so stated one.[11] Where the legislature made a statutory distinction, "it is the task of this court to give effect and meaning to that distinction." Est. of Miller v. Storey, 2017 WI 99, ¶42, 378 Wis. 2d 358, 903 N.W.2d 759; Kalal, 271 Wis. 2d 633, ¶46 ("Statutory language is read where possible to give reasonable effect to every word . . . .").

¶120 Courts function day to day making a whole variety of determinations that the legislature requires be made "in the best interests of the child." In those matters, the determinations are made in the discretion of the court with that consideration in mind. To suggest that the legislature really meant to write a burden of proof where none is written,[12] and

---

[11] Fundamental principles of statutory interpretation require us to determine that where the legislature used the same terminology throughout the same statutory section, in this case Chapter 48, the legislature meant it to have the same meaning. Additional statutory interpretation principles dictate that had the legislature wished to mandate a burden of proof at disposition in TPR proceedings, it would have clearly done so, as it did at the grounds phase, in the same chapter, dealing with the same statutory subject: TPR proceedings. See Wis. Stat. § 48.31; Wis. Stat. 48.426(3). But an analysis of the plain language of Wis. Stat. § 48.426(2) shows that the legislature chose not to mandate a burden of proof at the disposition phase in a TPR proceeding as it did at grounds. A survey of our statutes shows that the legislature has clearly mandated a burden of proof accompany the "best interests of the child" standard before. So, had the legislature wanted to mandate a statutory burden of proof at disposition in TPR proceedings, the legislature could have clearly done so. The fact that the legislature chose not to do so, is certainly instructive.

[12] There is no burden of proof at disposition in the plain language of the statute. The legislature chose not to include one. Instead, the legislature chose, as it did under other statutory schemes, simply to utilize the standalone "best interests of the child" standard.

21

that it "forgot" to write a burden of proof when it does just that in other subsections of the Children's Code, is contrary to fundamental statutory interpretation principles[13] and without support in the language of the statute.

¶121 In summary, in applying fundamental statutory interpretation principles to the statute before us, we determine that the there is no statutory burden of proof at the dispositional phase of a TPR proceeding. The plain text of Wis. Stat. § 48.426(2) is unambiguous; there is no statutory burden listed. Instead, the statute requires courts to utilize the "best interests of the child" standard. The legislature chose not to include a burden of proof in this statutory scheme even though the legislature included a burden of proof in other statutory schemes which also relied on the "best interests of the child" standard. In considering other statutes, we find that this legislative choice is not unique, particularly when considering the best interests of the child.

---

[13] Fundamental principles of statutory interpretation dictate that the phrase "best interests of the child" is presumed to bear the same meaning throughout the text. See Scalia & Garner, supra n.4, at 170-73 (Presumption of Consistent Usage). Moreover, we should not assume the legislature meant more than it said. We should give the statute's plain language its due. We are not "at liberty to disregard the plain, clear words of the statute" we are analyzing. State ex rel. Kalal v. Cir. Ct. for Dane Cnty., 2004 WI 58, ¶46, 271 Wis. 2d 633, 681 N.W.2d 110 (quoting State v. Pratt, 36 Wis. 2d 312, 317, 153 N.W.2d 18 (1967)). "We assume that the legislature's intent is expressed in the statutory language." Id., ¶44. We should respect the choice of the legislature to not place a burden of proof on the standard at disposition.

22

III

¶122 "The procedural due process clause protects individuals from governmental 'denial of fundamental procedural fairness.'" Thorp v. Town of Lebanon, 2000 WI 60, ¶53, 235 Wis. 2d 610, 612 N.W.2d 59 (quoting County of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998)). Because the statutes provide for a discretionary decision based on the evidence and testimony at disposition, a lack of burden of proof does not suggest the proceedings are so fundamentally unfair as to violate a parent's procedural due process guarantees. Instead, the TPR proceedings provide ample statutory and constitutional protections to ensure that a parent's rights are not erroneously terminated in an unfair and defective proceeding.

¶123 In the grounds phase of a TPR proceeding, if the parent pleads no contest to the grounds alleged in the petition, the court cannot just accept the plea. Instead, "[t]he circuit court must engage the parent in a colloquy to ensure that the plea is knowing, voluntary, and intelligent." Brenda B., 331 Wis. 2d 310, ¶35. "This colloquy is governed by the requirements of Wis. Stat. § 48.422(7)[14] and notions of due

---

[14] Under Wis. Stat. § 48.422(7), before the circuit court can "accept[] an admission of the alleged facts in the petition," it must:

   (a) Address the parties present and determine that the admission is made voluntarily with understanding of the nature of the acts alleged in the petition and the potential dispositions.

   (b) Establish whether any promises or threats were made to elicit an admission and alert all unrepresented parties to the possibility that a lawyer

23

process."[15]  Id., ¶35 (citing Waukesha Cnty. v. Steven H., 2000 WI 28, ¶¶25, 39, 233 Wis. 2d 344, 607 N.W.2d 607) (emphasis added).  But due process considerations do not mandate a burden of proof at the disposition phase because instead, during this phase, "[t]he focus shifts to the interests of the child." Julie A.B., 255 Wis. 2d 170, ¶28; Wis. Stat. § 48.426(2).  The parent's procedural due process rights at the disposition

---

> may discover defenses or mitigating circumstances which would not be apparent to them.
>
> (bm)  Establish whether a proposed adoptive parent of the child has been identified. . . .
>
> (br)  Establish whether any person has coerced a birth parent or any alleged or presumed father of the child in violation of s. 48.63(3)(b)5.  Upon a finding of coercion, the court shall dismiss the petition.
>
> (c)  Make such inquiries as satisfactorily establish that there is a factual basis for the admission.

See also Waukesha Cnty. v. Steven H., 2000 WI 28, ¶39, 233 Wis. 2d 344, 607 N.W.2d 607; Oneida Cnty. Dep't Soc. Servs. v. Therese S., 2008 WI App 159, ¶5, 314 Wis. 2d 493, 762 N.W.2d 122.

[15] To ensure parents' due process rights are protected, the court must ensure the parent "[has] knowledge of the constitutional rights he or she is giving up by making the plea."  Kenosha Cnty. Dep't Human Servs. v. Jodie W., 2006 WI 93, ¶25, 293 Wis. 2d 530, 716 N.W.2d 845.  This includes informing the parents of potential outcomes.  While the court is not required to inform parents of all potential outcomes, the court is required to inform the parent "of the statutory standard the court will apply at the second stage," namely, the best interests of the child.  Therese S., 314 Wis. 2d 493, ¶16. And, the court must inform parents that "the best interests of the child shall be the prevailing factor considered by the court in determining the disposition."  Id.; see also Brown Cnty. Dep't Human Servs. v. Brenda B., 2011 WI 6, ¶56, 331 Wis. 2d 310, 795 N.W.2d 730.

24

therefore are diminished because the parent has already been found to be unfit by the factfinder. "The best interests of the child do not 'prevail' until the parent has been declared unfit after fact-finding by the court or jury at the grounds phase of the TPR proceeding." Steven V. v. Kelley H., 2004 WI 47, ¶36, 271 Wis. 2d 1, 678 N.W.2d 856 (quoting Julie A.B., 255 Wis. 2d 170, ¶22).

¶124 During this phase, the court hears testimony from any interested party as to the disposition of the petition. Wis. Stat. § 48.427(1) ("Any party may present evidence relevant to the issue of disposition, including expert testimony, and may make alternative dispositional recommendations to the court."). The court weighs the testimony received against all of the statutory factors in Wis. Stat. § 48.426(3).[16] The court may yet decide to "dismiss the petition if it finds the evidence does not warrant the termination of parental rights." Wis. Stat. § 48.427(2). Or, the court may decide to terminate the parental rights of one parent. Wis. Stat. § 48.427(3). Or, the court may decide to terminate the parental rights of both parents.

---

[16] Majority op., ¶7 n.6; State v. Margaret H., 2000 WI 42, ¶15, 234 Wis. 2d 606, 610 N.W.2d 475 (agreeing with court of appeals' decision to remand, notwithstanding its erroneous statutory interpretation, because "the record indicates that the circuit court failed to consider all of the relevant statutory factors enumerated under Wis. Stat. § 48.426(3)" (emphasis added)); Julie A.B., 255 Wis. 2d 170, ¶4 (concluding the court "must consider . . . the six factors enumerated in § 48.426(3) in determining the best interests of the child" but "the court may also consider other factors . . . but all factors relied upon must be calibrated to the prevailing standard: the best interests of the child").

25

Id. Whatever the outcome chosen, in exercising its discretion at disposition, the court must ensure its decision is in "the best interests of the child."

¶125 This procedure recognizes the profound interests involved in terminating a parent's rights. On the one hand, the parent has a strong interest in the continuation of the family unit and child rearing. Stanley v. Illinois, 405 U.S. 651 (1972). This interest though comes into tension with the State's interest in the welfare and well-being of the child. Lassiter v. Dep't of Soc. Servs., 452 U.S. 18, 27 (1981). Because these two colliding interests are at stake, "[w]hen the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures." Santosky, 455 U.S. at 753-54. In Santosky, the United States Supreme Court applied the three-factor analysis from Mathews v. Eldridge, 424 U.S. 319 (1976),[17] to determine that factual findings of a parent's unfitness for parental termination decisions required a clear and convincing burden of proof. See Santosky, 455 U.S. at 769. Like Wisconsin's TPR procedures, the New York statutes at issue in Santosky also involved a two-step process with the first part being a factual determination of the parent's unfitness which, if determined by the factfinder, then proceeds

---

[17] In determining what procedural due process protections are owed, the Court considered three factors: "the private interest that will be affected by the official action[,] . . . the risk of an erroneous deprivation of such interest through the procedures used[,] . . . and [] the Government's interest[.]" Mathews v. Eldridge, 424 U.S. 319, 335 (1976).

26

to a secondary determination of "what placement would serve the child's best interests." Id. at 748. The Court's holding requiring a higher burden of proof than preponderance of evidence was only in relation to the first part of the termination proceedings involving factual findings. Id. at 769.

¶126 Once the State has met this burden, the private interests of the parent are diminished at this stage of the proceedings because the factual finding of unfitness has already been established. The government's interest to promote and provide for the welfare of the child becomes heightened with the factual finding of the parent's unfitness. Procedural due process requirements are thus satisfied when, as here, the circuit court considers the non-exhaustive list of statutory factors, Wis. Stat. § 48.426(3)(a)-(f), as required in making its determination of what is in the best interests of the child. This, combined with the procedural process allowing for an open evidentiary hearing, satisfies what procedural due process requires. Additionally, all parties in this stage of the proceeding are allowed to produce any relevant testimony and evidence to aid the circuit court in its best interests of the child determination.

¶127 Decisions as to the "best interests of the child" lie within the discretionary domain of the circuit court. Julie A.B., 255 Wis. 2d 170, ¶42 ("[T]he wise and compassionate discretion of the court will determine whether termination will 'promote the best interests of the child.'" (citation omitted)). Instead, "[i]t is the best interests of the child that is the

27

'polestar' at the dispositional hearing." Brenda B., 331 Wis. 2d 310, ¶33 (citing Julie A.B., 255 Wis. 2d 170, ¶30). But, the court's discretion as to what is in the child's best interest is tethered to the evidence presented and to consideration of the mandatory statutory requirements, while complying with procedural due process.

¶128 While "[t]he ultimate determination of whether to terminate parental rights is discretionary with the circuit court," Margaret H., 234 Wis. 2d 606, ¶27, parents and child alike are provided multiple statutory layers of protection throughout the TPR procedures. These statutory layers of protection ensure that:

> While, as in all discretionary acts of a court, reasonable persons may sometimes differ in the outcome, all that this court need find to sustain a discretionary act is that the trial court examined the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach.

Loy v. Bunderson, 107 Wis. 2d 400, 414-15, 320 N.W.2d 175. Procedural "due process is flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U.S. 471, 481 (1972). In this situation, the circuit court's discretionary decision at disposition does not require a burden of proof. Instead, the child's best interest is paramount.

IV

¶129 Consequently, I conclude that for the TPR statutes applicable in this case, Wis. Stat. § 48.31 and Wis. Stat. § 48.426(2), no burden of proof applies at disposition and the

court correctly stated the "best interests of the child" standard applicable at disposition. We should not shy away from determining that which has been agreed to by the parties, determined by the court of appeals, comported with the requirements of procedural due process, and is apparent from the plain language of the statutes.

¶130 For the foregoing reasons, I respectfully concur.

¶131 I am authorized to state that Justice REBECCA GRASSL BRADLEY joins this concurrence.

¶132 ANN WALSH BRADLEY, J. *(concurring)*. I join the majority opinion with the exception of paragraphs 65-67. I write separately to briefly emphasize and clarify two points.

¶133 First, I emphasize that we do not decide whether there is a burden of proof at disposition, and if so, what that burden is. Majority op., ¶6 n.4. Chief Justice Ziegler's concurrence notwithstanding, we have not been presented with either argument or adversarial briefing on such questions.[1] Thus, under the current state of our case law, the circuit court at the plea colloquy must state the "statutory standard," i.e., the "best interest of the child." Oneida Cnty. Dep't of Soc. Servs. v. Therese S., 2008 WI App 159, ¶16, 314 Wis. 2d 493, 762 N.W.2d 122.

¶134 Second, because we do not decide whether there is a burden of proof at disposition, I write to clarify that we need not resolve whether any potential burden is a "trial right." The majority opinion's discussion on this point may foster confusion. See majority op., ¶¶65-67. It could be read to condition whether something is a "right" on whether the circuit court refers to it as such. This cannot be.

---

[1] I observe that the court of appeals, in a recent unpublished opinion, determined that there is a burden at the disposition stage, and that the burden is a preponderance of the evidence. State v. H.C., No. 2023AP1950, unpublished slip op., ¶2 (Wis. Ct. App. Mar. 5, 2024). I cite to an unpublished opinion for the singular purpose of illustrating that the issue is a live one, which has been percolating below. See Wis. Stat. § (Rule) 809.23(3).

¶135 While muddying the waters, the opinion may also call into question this court's decision in Brown Cnty. Dep't of Human Servs. v. Brenda B., 2011 WI 6, 331 Wis. 2d 310, 795 N.W.2d 730. I clarify that Brenda B. remains good law and that in no way is a "right" contingent on how the circuit court refers to it in a plea colloquy.

¶136 The majority states that the circuit court here used the term "rights" in the plea colloquy to "precisely and specifically" refer to "procedural and constitutional rights: the right to a trial (to a jury or a judge), the right to call and cross-examine witnesses, the right to subpoena witnesses, and the right to testify or to remain silent." Majority op., ¶65. However, this list of procedural and constitutional rights is not exhaustive.

¶137 In Brenda B., the court referred to the importance of a parent understanding that the parent gives up the "right to make the petitioner prove unfitness by clear and convincing evidence" when pleading no contest at the grounds phase of a TPR proceeding. Brenda B., 331 Wis. 2d 310, ¶43 (emphasis added). Holding the State to its burden is similarly described as a "right" in other contexts. For example, in the seminal United States Supreme Court case In re Winship, 397 U.S. 358 (1970), the Court refers to the burden of proof of beyond a reasonable doubt as "as much required during the adjudicatory stage of a delinquency proceeding as are those constitutional safeguards [of] . . . notice of charges, right to counsel, the rights of confrontation and examination, and the privilege

2

against self-incrimination."  Id. at 368; see also State v. Kelty, 2006 WI 101, ¶42, 294 Wis. 2d 62, 716 N.W.2d 886 (referring to "the defendant's right to make the state prove beyond a reasonable doubt the facts necessary to support guilt") (emphasis added).  Under such an understanding, there would be no argument that in a criminal case the right to hold the State to its burden of proof beyond a reasonable doubt is not a "right."

¶138 The majority opinion in the present case could be read to confuse this understanding.  Its analysis is predicated on what the circuit court said, not whether holding the State to a particular burden is actually a "right."  The opinion could imply that something is not a "right" unless the circuit court refers to it as such.  Clearly, a legal "right" is a "right" regardless of what the circuit court says or fails to say.

¶139 For the reasons stated above, I respectfully concur.

¶140 I am authorized to state that Justice JANET C. PROTASIEWICZ joins this concurrence.